IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | |
|---|---|
| THE UNITED STATES OF AMERICA §<br>*ex rel.*, CHARLES TERRENCE BRUFF, §<br>          Plaintiff, §<br>§<br>BRINGING THIS ACTION ON BEHALF §<br>OF THE UNITED STATES OF §<br>AMERICA §<br>§<br>§<br>c/o   Hon. Ashley C. Hoff §<br>      United States Attorney §<br>      Western District of Texas §<br>      601 NW Loop 410, Ste. 600 §<br>      San Antonio, TX 78216 §<br>§<br>and  Hon. Merrick Garland §<br>      Attorney General of the §<br>      United States §<br>      United States Department of Justice §<br>      950 Pennsylvania Avenue NW §<br>      Washington, D.C. 20530-0001 §<br>§<br>-v- §<br>§<br>USAA INSURANCE AGENCY, INC., §<br>CAREMARK RX, L.L.C., OPTUMRX, INC, §<br>EXPRESS SCRIPTS, INC. §<br>          Defendants. § | CASE NO. 5:22-cv-593 |

PLAINTIFF THE UNITED STATES OF AMERICA *EX REL.,* CHARLES TERRENCE
BRUFF'S ORIGINAL COMPLAINT

TO THE HONORABLE UNITED STATES DISTRICT COURT JUDGE:

      NOW COMES The United States of America *ex rel.,* Charles Terrence Bruff ("United

States" or "Plaintiff") and files this complaint against USAA Insurance Agency, Inc., Caremark

RX, L.L.C., OptumRX, Inc., and Express Scripts, Inc. for fraud involving Medicare and Medicaid, and in support respectfully shows as follows:

## I.
## PARTIES

1. Charles Terrence Bruff is the Relator in this *qui tam* action filed under the False Claims Act.

2. Bruff resides in Bexar County, Texas.

3. Bruff works for Defendant as a software engineer in Bexar County, Texas.

4. Pursuant to 31 U.S.C. § 3730(b)(1) this action is brought in the name of the United States and Bruff.

5. USAA is the Defendant in this case.

6. USAA is a Texas corporation headquartered in Bexar County, Texas.

7. Caremark, L.L.C. is a for-profit Pharmacy Benefits Manager incorporated in Delaware.

8. OptumRX, Inc. is a for-profit Pharmacy Benefits Manager incorporated in California.

9. Express Scripts, Inc. is a for-profit Pharmacy Benefits Manager incorporated in Delaware.

## II.
## FILING AND SERVICE REQUIREMENTS

10. Pursuant to 31 U.S.C. § 3730(b)(2), this action has been filed under seal.

11. This action shall remain under seal for at least sixty (60) days and will not be served on the Defendant until ordered to do so by this Court.

12. The United States Attorney General and the United States Attorney for the Western District of Texas will be served with a copy of this complaint.

13. Relator will also transmit to the Department of Justice an attorney-client privileged "Relator's Statement" and associated documents.

14. Pursuant to the False Claims Act, Relator's Statement contains written disclosure of substantially all material evidence and information the Relator possesses.

### III.
### JURISDICTION AND VENUE

15. This Court has subject matter jurisdiction because this case arises under a federal statute, namely the Federal False Claims Act, 31 U.S.C. § 3729, *et seq*.

16. This Court has personal jurisdiction because Defendants can be found, reside in, and/or transact business in Bexar County, Texas, which is within this federal district. Furthermore, the actions giving rise to the false claim occurred in Bexar County, Texas, which is within this federal district.

17. Venue is appropriate because Defendants conduct a substantial part of all of its activities within Bexar County, Texas.

### IV.
### FACTS

18. In 2016, Mr. Charles Terrence Bruff first began working for USAA as a software engineer.

19. USAA is an insurance agency founded in 1922 that currently serves millions of people in the military community, including active duty military, veterans, and their families.

20. Mr. Bruff is an adult disabled child of his father and receives social security disability benefits. Specifically, Mr. Bruff has Autism and Cerebral Palsy. As such, Mr. Bruff receives both Medicare and Medicaid, which means he is enrolled in Part D and Extra Help.

21. Part D is Medicare's prescription drug coverage. Extra Help is a program within Part D that helps beneficiaries who have limited resources and income with monthly premiums, annual deductibles, and co-pays related to prescription drug coverage.

22. As an employee of USAA, Mr. Bruff also has coverage through the USAA Employer Group Health Plan or GHP.

23. The USAA GHP's prescription drug coverage is administered by CVS' Caremark RX, L.L.C., a pharmacy benefits manager or PBM.

24. Under Federal law, a government program such as Medicare or Medicaid can seek reimbursement from PBMs or the private insurer if it paid for a prescription drug claim that should have been covered by the private insurance.

25. When an individual is covered by Medicare and/or Medicaid as well as another health plan, the health plans must coordinate with each other regarding which plan is the primary payer and which plan is the secondary payer.

26. The rules regarding when Medicare is the secondary payer are detailed in section 1862(b) of the Social Security Act, which is found in 42 U.S.C. § 1395y(b). There is also guidance and regulations that detail the requirements as well. Under § 1395y(b)(1)(B), disabled individuals in large group health plans are covered by the Medicare Secondary payer law. A large group health plan is a group health plan offered by or contributed to by an employer with 100 or more employees. *See* 42 U.S.C. § 1395y(b)(1)(B)(iii); 26 U.S.C. § 5000(b)(1). Under § 1395y(b)(2), the GHP is the primary payer and Medicare is the secondary payer.

27. Because USAA has more than 100 employees, the GHP that Mr. Bruff is a part of as a current USAA employee is a large group health plan under the Medicare Secondary Payer provisions. That means that the GHP should be the primary payer and Medicare should be secondary, only paying for things the GHP does not cover. Further, Medicaid is always the payer of last resort.

28. Yet that is not what happens at USAA, at least with regards to prescription drug coverage.

29. With prescription drug coverage, USAA and Caremark refuse to coordinate benefits with public programs such as Medicare and Medicaid.

30. USAA and Caremark's refusal to coordinate benefits results in Medicare being the primary payer for care that should be covered by the USAA GHP.

31. USAA and Caremark's practice thus results in Medicare paying potentially hundreds of thousands of dollars each year that USAA should be paying under federal law.

32. USAA and Caremark's practice can also result in neither Medicare nor USAA paying for drug coverage and leading to a complete suspension of payment for medical services. If these services are time-sensitive, then USAA and Caremark's actions could result in significant harm and even death.

33. The above are not hypothetical scenarios, as they happened to Mr. Bruff. As mentioned above, Mr. Bruff is part of both the USAA GHP and Medicare Part D with Extra Help.

34. Mr. Bruff first discovered the lack of coordination between USAA, Caremark, and Medicare regarding his drug coverage a few months after starting at USAA on August 22, 2016. Then, Mr. Bruff found out that USAA does not coordinate benefits for anyone who has both private insurance through USAA and public healthcare. Mr. Bruff raised this issue with USAA's HR, stating that he believed it violated federal law and could constitute Medicare fraud since USAA was making the government pay for services it should have paid for. USAA ultimately agreed to fix the issue and coordinate care for Mr. Bruff, but failed to do it for any other employees in a similar position. Including Medicaid entitlement, there are potentially hundreds of plan members impacted just at USAA alone.

35. In January 2021, Mr. Bruff became depressed and took FMLA leave. When he did so, USAA and Caremark once again flipped his coverage attempting to designate itself as the

secondary payer after Medicare. However, USAA never informed Medicare of this issue. That lead to both insurers claiming to be secondary and the complete suspension of payment for all medical services and drug claims needed by Mr. Bruff during that time.

36. Mr. Bruff again brought this issue up to USAA, providing legal information and links showing that coordination of care is required. Again, USAA only fixed the issue for Mr. Bruff and no one else.

37. To date, neither USAA nor Caremark has repaid Medicare for any drug claims that Medicare erroneously paid for Mr. Bruff. Further Caremark has never sought Medicare reimbursement from the USAA GHP.

38. The fact that USAA can so easily coordinate care for Mr. Bruff's drug coverage shows that USAA can do the same for every other similar employee and stop defrauding Medicare.

39. Indeed, Caremark makes coordination of benefits extremely easy by allowing its clients to elect whether or not to turn on a flag that requires coordination of benefits. By offering this option, Caremark knows that if a company turns off its flag, it will be submitting claims to government programs like Medicare and Medicaid for dual eligible individuals that should be paid by the private insurance company.

40. Mr. Bruff's situation where he has both employer insurance and public coverage is not uncommon. For example, children of divorced parents are often covered by both a parent's employer GHP and Medicaid. If an employer's GHP is not coordinating benefits with Medicaid, then Medicaid, the payer of last resort under federal law, is improperly paying for coverage the GHP should pay for. That is fraud.

41. USAA and Caremark's refusal to coordinate prescription drug coverage with public programs also results in Medicaid being essentially billed twice for services. Here is how

that happens. Forty-nine states have a program called the Health Insurance Premium Payment program or HIPP. Under that program Medicaid will pay the premiums for employer sponsored health insurance if one of the family members is on Medicaid and one of the family members has an employer plan that can also cover the person with Medicaid. If there is no coordination of benefits, which is how USAA operates, then Medicaid is both paying for the employer insurance premiums that should cover prescription drugs *and* for the prescription drugs that the employer insurance plan should have paid for. That is also fraud.

42. Not only does USAA's actions defraud the government of hundreds of thousands, if not millions of dollars, but it can also lead to heart wrenching choices for parents and unnecessary hardship when parents have to decide whether they can afford necessary medication for their children. For example, states have prescription drug limits for individuals on Medicaid if there is no private primary payer. In Texas, that limitation is three medications per month for an adult over 21 years old. This means that an individual or a child who requires more than three prescriptions per month may not be able to get the medication needed because of additional cost.

43. Again, the above are not mere hypotheticals. As a child growing up in Louisiana with Autism and Cerebral Palsy, Mr. Bruff needed physical therapy, but was not able to get it because Medicaid in Louisiana did not cover it and it was otherwise unaffordable. A similar situation could easily arise today where prescriptions and medical treatment are not provided because of Medicaid limits and USAA's failure to coordinate coverage with public plans.

44. This situation extends well beyond USAA and Caremark's administration of that plan.

45. Specifically, all Caremark administered plans are permitted to turn on or off the flag for coordination of benefits. By offering this option to all of its clients, Caremark enables fraud by letting providers and pharmacies present claims for payment to government programs like Medicare and Medicaid for dual eligible individuals that should be paid by the private insurance company. Many examples of this can be provided by Relator.

46. OptumRX engages in a similar practice with all of its administered plans by allowing GHPs to determine whether to coordinate benefits with public programs. For example, Walmart's prescription drug plan is administered by OptumRX. According to Walmart's plan, it does not allow employees who qualify for Medicare Part D to enroll in its employee health plan. This makes it impossible for dual eligible to enroll, which means the government is paying for claims that should be covered by the private insurer. That is fraud. Numerous additional examples can be provided by Relator.

47. Express Scripts does the same thing. For example, Express Scripts administered Wells Fargo's prescription drug plan. According to that plan, Wells Fargo does not coordinate care with any program including Medicare Part D, Medicaid, and Tricare. For the same reasons that what OptumRX, Caremark, and USAA's practices constitute fraud, this refusal to coordinate care by Express Scripts also results in fraud. It results in fraud because it causes the government to pay for care that would be covered by a private insurer. Again, numerous examples of this can be provided by Relator.

48. Based on relator's ongoing research into this issue, looking at just 31 Fortune 500 companies, including Walmart, BMO Financial, Wells Fargo, ConocoPhillips, Merck, American Airlines, and others, over four million people are potentially affected by similar coordination fraud where the PMB and private insurer do not properly coordinate benefits

with public programs causing these programs to pay for services and prescriptions they should not have to cover. The estimated cost to the government of this fraud by these PBMs and these companies is anywhere from $2 to 4 billion dollars.

## V.
## CAUSE OF ACTION: QUI TAM

49. As described above, USAA, Caremark, OptumRX, and Express Scripts knowingly cause Medicare, Medicaid, Tricare to be charged for prescription drugs that should be covered by USAA's GHP or the GHPs of the PBM's clients.

50. As described above, Defendants knowingly make, use, or cause to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government.

## VII.
## DAMAGES

51. Relator seeks treble actual damages suffered by the United States.

52. Relator seeks a civil penalty of not less than $5,000 nor more than $10,000, which upwardly adjusted for inflation equals $11,665 and $23,331, respectively, for each false statement made or claim submitted.

53. Relator seeks all costs incurred in recovering damages or penalties.

54. Relator seeks attorney fees.

55. Relator seeks pre and post judgment interest at the maximum rate allowed by law.

56. Relator seeks an award of a percentage of the damages recovered, at the maximum percentage allowed by law.

WHEREFORE, premises considered, Relator respectfully prays that upon a trial on the merits that damages be awarded in the amount sought herein and for such other and further relief to which he is justly entitled whether at law or in equity.

Respectfully submitted,
WILEY WALSH, P.C.

By: _____/s/ Colin Walsh_____
Colin Walsh
Texas Bar No. 24079538
*Board Certified Specialist, Texas Board of Legal Specialization, Labor and Employment Law*
Jairo Castellanos
Texas Bar No. 24089624

WILEY WALSH, P.C.
1011 San Jacinto Blvd., Ste. 401
Austin, TX 78701
Telephone: (512) 271-5527
Facsimile: (512) 201-1263
colin@wileywalsh.com
ATTORNEYS FOR PLAINTIFF