UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| THE UNITED STATES OF AMERICA<br>*ex rel.*, CHARLES TERRENCE BRUFF, | §<br>§<br>§ | No. 5:22-cv-593-DAE |
| Plaintiff, | §<br>§<br>§ | |
| v-<br>UNITED SERVICES AUTOMOBILE ASSOC.,<br>CAREMARK RX, L.L.C., OPTUMRX, INC,<br>and EXPRESS SCRIPTS, INC., | §<br>§<br>§<br>§<br>§ | |
| Defendants. | §<br>§ | |

**THE UNITED STATES OF AMERICA *EX REL.*, CHARLES TERRENCE BRUFF'S**
**<u>AMENDED COMPLAINT</u>**

The United States of America ex rel., Charles Terrence Bruff ("Mr. Bruff") sues the Defendants

United Services Automobile Association ("USAA"), Caremark RX, L.L.C. ("Caremark"), OptumRX,

Inc. ("Optum"), and Express Scripts, Inc. (Express Scripts") pursuant to the civil False Claims Act, 31

U.S.C. § 3729 et seq. ("FCA"), for fraud involving Medicare and Medicaid, and states:

**INTRODUCTION**

1. Plaintiff brings this FCA action as a Relator to recover damages resulting from a scheme

orchestrated by USAA – and conducted with the knowledge and acquiescence of Caremark – that

specifically targets disabled Medicare and Medicaid enrollees like Mr. Bruff. In concert with Caremark,

USAA bilks Medicare and Medicaid of millions of dollars by sloughing off to these government programs

USAA's obligations to pay for the prescription drugs provided to its disabled employees enrolled in its

large group health plan.

2. Medicare and Medicaid are administered by the Centers for Medicare & Medicaid Services

("CMS"). CMS is a federal agency within the U.S. Department of Health and Human Services.

3. USAA knowingly conceals and improperly avoids and decreases its obligations to pay the

cost of the prescription drugs provided to its employees enrolled in USAA's large group health plan when

those employees are also Medicare Part D beneficiaries. The cost of these prescription drugs should be paid by USAA pursuant to the "Disabled individuals in large group health plans" provisions of the Medicare Secondary Payer Act ("MSP Act") (42 U.S.C. § 1395y(b)(1)(B)(i)), and, if the United States Government is improperly forced to pay conditionally because USAA ducked its primary payer obligations, payment must be reimbursed to it by USAA within sixty (60) days. USAA neither pays nor reimburses.

4. Mr. Bruff is an employee of USAA who is enrolled in USAA's large group health plan. At all times material hereto, he was also a beneficiary of both Medicare Part D and Medicaid which are safety nets designed to pay for the prescription drugs provided to retired and disabled Americans.

5. As a large group health plan under the MSP Act, USAA is the primary payer of Mr. Bruff's prescription drugs. Medicare and Medicaid are payers of last resort.

6. Caremark administers Mr. Bruff's Part D prescription drugs. Whenever Mr. Bruff would fill his prescriptions, it was Caremark who processed the payments. Caremark knows that the USAA large group health plan is the primary payer of Mr. Bruff's prescription drugs. Nevertheless, it does not charge and does not bill USAA for Mr. Bruff's prescription drugs and instead charges the Medicare program.

7. Proper compliance with the MSP Act should lead to tremendous savings for the Medicare program. This is especially true where large group health plan coverage should come into play. However, with prescription drug coverage, USAA and Caremark refuse to step up and coordinate benefits with CMS.

8. USAA and Caremark's refusal to coordinate benefits results in Medicare and Medicaid being the default payers for prescription drugs that should be paid by the USAA group health plan. Worse still, USAA refuses to reimburse Medicare and Medicaid when USAA learns that these programs have paid for Mr. Bruff's prescription drugs.

9. To date, neither USAA nor Caremark has repaid CMS for any prescription drug charges that CMS erroneously paid on behalf of Mr. Bruff. Further Caremark has never sought reimbursement from the USAA large group health plan for these payments.

10. Mr. Bruff has uncovered that this is not a glitch in the system – it is a feature. USAA never coordinates with CMS regarding payment for the prescription drugs provided to USAA's group health plan enrollees. And when payment is made by Medicare and Medicaid, USAA never reimburses CMS for these payments.

11. USAA well knows that it is a primary payer. It also knows every single time that CMS pays for the prescription drugs provided to its disabled employees. It also knows that it is obligated to reimburse CMS for these payments. It simply refuses to pay in the first instance and then, after CMS picks up the tab, USAA is nowhere to be found.

12. To add insult to injury, USAA forces CMS to carry its own cross. Under Texas's Health Insurance Premium Payment (HIPP) program[1], Medicaid often pays the premiums for employer sponsored health insurance if one of the family members is on Medicaid and one of the family members has an employer plan that can also cover the person with Medicaid. USAA thus forces Medicaid to both pay for USAA's group health plan premiums *and* for the prescription drugs that the group health plan should pay for but never does.

**JURISDICTION AND VENUE**

13. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331, 1345, and 1367(a). Pursuant to 31 U.S.C. § 3730(b)(1) this action is brought in the name of the United States and Mr. Bruff.

14. This Court may exercise personal jurisdiction over Defendants pursuant to 31 U.S.C. § 3732(a) because the Defendants committed acts within this District or directly benefited from those acts that violated 31 U.S.C. § 3729.

---

[1] Forty-nine states have a program called the Health Insurance Premium Payment program or HIPP. Under that program Medicaid will pay the premiums for employer sponsored health insurance if one of the family members is on Medicaid and one of the family members has an employer plan that can also cover the person with Medicaid. If there is no coordination of benefits, which is how USAA operates, then Medicaid is both paying for the employer insurance premiums that should cover prescription drugs and for the prescription drugs themselves that the employer insurance plan should have paid for.

15. Venue is proper in the Western District of Texas under 31 U.S.C. § 3732 and 28 U.S.C. § 1391(b). This Court may exercise personal jurisdiction over Defendants pursuant to 31 U.S.C. § 3732(a) because the Defendants committed acts within this District or directly benefited from those acts that violated 31 U.S.C. § 3729, and the Defendants can be found, reside in, and/or transact business in Bexar County, Texas, which is within this federal district. Furthermore, the actions giving rise to the false claim occurred in Bexar County, Texas, which is within this federal district.

## PARTIES

16. Charles Terrence Bruff is the Relator in this action filed under the False Claims Act. Mr. Bruff resides in Bexar County, Texas.

17. Mr. Bruff works for Defendant USAA as a software engineer in Bexar County, Texas.

18. USAA is a Texas corporation headquartered in Bexar County, Texas.

19. Caremark is a for-profit Pharmacy Benefits Manager ("PBM") incorporated in Delaware.

20. OptumRX is a for-profit PBM incorporated in California.

21. Express Scripts is a for-profit PBM incorporated in Delaware.

## GOVERNING LAWS AND REGULATIONS

### A. FALSE CLAIMS ACT

22. The civil FCA is the federal government's chief weapon in combating waste, fraud, and abuse of public funds. The FCA imposes civil liability on any person who knowingly deprives the United States of property. *See* 31 U.S.C. § 3729(a)(1).

23. The purpose of the False Claims Act is to penalize any business that, as here, causes false Medicare billings by engaging in "deceptive practices." *U.S. v. Halper,* 490 U.S. 435, 445 (1989), *abrogated on other grounds by Hudson v. U.S.*, 522 U.S. 93 (1997).

20. Significantly, the FCA's scienter requirement is satisfied by demonstrating a defendant's actual knowledge, deliberate ignorance, or reckless disregard of the truth or falsity of the obligation to pay

or transmit money or property. 31 U.S.C. § 3729(b)(1)(A). And "no proof of specific intent to defraud is required." *Id*. at § 3729(b)(1)(B).

21. Congress has defined an "obligation" under the FCA as "an established duty, whether or not fixed, arising from . . . statute or regulation, . . . ." 31 U.S.C. § 3729(b)(3).

22. A private person may bring a civil action for a violation of the FCA. 31 U.S.C.S. § 3730. In amending the FCA in 1986, Congress recognized that conduct that generates false claims is "inherently deceptive." 132 CONG. REC. S 11238-04 (1986), p. 16, 1986 WL 783415. Accordingly, the FCA permits a relator to bring suit against a person who wrongfully retained money from the United States Government by failing to pay what they were supposed to. *Se §§* 3729(a), 3730(b). *See also United States ex rel. Univ. Loft Co. v. Blue Furniture Sols., LLC*, No. 1:15-CV-588-LY, 2018 U.S. Dist. LEXIS 159506, at *5-6 (W.D. Tex. Sep. 18, 2018).

## B. MEDICARE SECONDARY PAYER ACT

23. In 1980 Medicare was on the brink of insolvency. Congress passed the MSP Act to save it.

24. Prior to the MSP Act, Medicare paid for all medical treatment within its scope, leaving private insurers and group health plans to pick up any remaining expenses. Meaning Medicare was primary always. It was probably the only health insurer that did not engage in subrogation or coordination of benefits. The MSP Act changed that. Under the MSP Act, Congress mandated that large group health plans such as USAA's —rather than Medicare—should be responsible for the medical expenses incurred by its employee enrollees. After all, such plans are an employment fringe benefit and enrolled employees pay premiums to the large group health plans. Thus 42 U.S.C. § 1395y (b)(1)(B)(i) provides as follows:

**(B)** Disabled individuals in large group health plans.

**(i)** In general. A large group health plan (as defined in clause (iii)) may not take into account that an individual (or a member of the individual's family) who is covered under the plan by virtue of the individual's current employment status with an employer is entitled to benefits under this title [42 USCS §§ 1395 et seq.] under section 226(b) [42 USCS § 426(b)].

25. In short, Congress intended to transfer the financial burden of healthcare provided to disabled employees such as Mr. Bruff to a large group health plan funded by the employer such as USAA's group health plan. A large group health plan is a group health plan offered by or contributed to by an employer with 100 or more employees. *See* 42 U.S.C. § 1395y(b)(1)(B)(iii); and 26 U.S.C. § 5000(b)(1).

26. Under the MSP Act, USAA may not take into consideration that Mr. Bruff receives Medicare benefits. *See Waters v. Farmers Texas* County *Mut. Ins. Co*, 9 F.3d 397, 399-400 (5th Cir. 1993)("The Medicare Secondary Payer statute, 42 U.S.C. § 1395y(b), makes Medicare the secondary payer to group health insurance, workers' compensation, and automobile and liability insurance. Group health insurance, workers' compensation, and automobile and liability insurance are to be the primary payers of medical costs for Medicare beneficiaries.") "Under current law, Medicare is the secondary payer where services are covered by: . . .6. Large group health plans (plans of one or more employers where at least one of the employers has 100 or more full or part-time employees) in the case of a disabled individual whose coverage is based on his or her current employment or on the current employment of a family member." 59 FR 4285.

27. At all times material hereto, Mr. Bruff received Medicare Part D benefits. Part D is Medicare's prescription drug coverage. As an employee of USAA he is also enrolled in USAA's group health plan, which also includes prescription drug coverage.

28. As regards to payment for Mr. Bruff's prescription medication, USAA's group health plan is primary and Medicare and Medicaid are secondary payers.

29. Even though Medicare and Medicaid should not pay for prescription drugs when a group health plan is primary, the law allows Medicare and Medicaid to make conditional payments in order to alleviate the cash flow burden on providers and for the general benefit of its enrollees. 42 U.S.C. § 1395y(b)(2)(A)(ii)); 42 U.S.C. § 1395y(b)(2)(B)(i). *See also Cochran v. U.S. Health Care Fin. Admin.,* 291 F.3d 775, 777 (11th Cir. 2002)("In order to accommodate its beneficiaries, however, Medicare does make conditional payments for covered services, even when another source may be obligated to pay, if

that other source is not expected to pay promptly.") Medicare and Medicaid can make these <u>conditional</u> payments to cover an enrollee's drug costs when the primary payer cannot reasonably be expected to make payment with respect to such item or service <u>promptly</u>. *Id.* at 1355. *See also Caldera v. Ins. Co. of Pa.,* 716 F.3d 861, 863 (5th Cir. 2013)("A federal cost-saving statute, the MSP makes the government a secondary payer when a Medicare recipient has another source of primary insurance coverage. In other words, Medicare serves as a back-up insurance plan to cover that which is not paid for by a primary insurance plan.")(Citations are omitted.)

30. A primary payer such as USAA is obligated to reimburse Medicare for the conditional payment within 60 days. ("[A] primary plan . . . shall reimburse the appropriate Trust Fund for any payment made by the Secretary under this subchapter with respect to an item or service if it is demonstrated that such primary plan has or had a responsibility to make payment with respect to such item or service."). 42 U.S.C.§ 1395y(b)(2)(B)(ii). The law defines a "primary plan" as, among others, "a group health plan or large group health plan, . . ." 42 U.S.C. § 1395y(b)(2)(A). *See also Waters v. Farmers Texas* County *Mut. Ins. Co*, 9 F.3d 397, 399-400 (5th Cir. 1993)("The federal statute expressly provides that any payment of medical costs by Medicare for which private insurance is the primary payer is conditioned upon reimbursement from the insurer or any recipient of the insurance proceeds. <u>42 U.S.C.A. § 1395y(b)(2)(B)(i) (West Supp.1993)</u>.")

31. This requirement mandates that the primary plan reimburse Medicare <u>on its own initiative</u>. 42 U.S.C. § 1395y(b)(2)(B)(ii). Primary plans, like USAA, are required to seek out and provide material information regarding the underlying primary payer situation to Medicare. See 42 U.S.C. § 1395y(b)(8)(A)-(C); 42 § C.F.R. 411.25(a)-(c); 59 Fed. Reg. 4287 "42 CFR 411.25 requires a third-party payer to notify HCFA [Health Care Financing Administration or "HCFA" is the former name for CMS] when it learns that Medicare has made conditional primary payment for items or services for which the third-party payer has made or should have made primary payment." 59 FR 4285, 4286.

32. In this way, the statutory and regulatory framework anticipates that material information is in the primary plan's unique possession. Accordingly, primary payers like USAA are required to provide "notice about primary payment responsibility and information about the underlying MSP situation" to the Medicare payer. 42 C.F.R. § 411.25; 59 Fed. Reg. 4285 (Jan. 31, 1994).

33. Congress subsequently further amended the MSP Act by passing the PAID Act. See Pub. L. No. 116-215, Title III, § 1302, 134 Stat 1041, 1045 (Dec. 11, 2020). CMS now tells a primary plan specifically whether a Medicare beneficiary is enrolled under a Medicare Part D program so that there can be no misunderstanding of when USAA is primary. The PAID Act further facilitates what primary plans were already statutorily obligated to do: investigate Medicare conditional payments and provide for appropriate reimbursement.

34. All these requirements address, and should remedy, the reality that Medicare and Medicaid are at a recognized informational disadvantage in identifying primary payers.

35. Proper compliance with the MSP Act should lead to tremendous savings for the Medicare program. Especially in instances where large group health plan coverage should come into play. However, CMS can not seek reimbursement when the primary payer lurks in the dark.

36. CMS's inability to discover liability for unreimbursed conditional payments is well-documented. As the Eleventh Circuit Court of Appeals put it, "[w]hen Medicare pays . . . it is paying 'in the dark'—it does not know, and <u>cannot</u> know, whether someone else will pay." *United States v. Baxter Int'l, Inc.*, 345 F.3d 866, 901 (11th Cir. 2003) (internal quotes omitted) (emphasis in the original). "Between two sources of coverage, the insurer that pays second is in the superior position to prevent an erroneous or misdirected payment. The first payer can avoid such an outcome only by refusing to pay at all. Congress foreclosed that option in 42 U.S.C. §§ 1395y(b)(2)(A) and (b)(2)(B) by providing for Medicare to pay first where payment from the primary insurer was not reasonably forthcoming." *Id.* at 901.

37. This is why Congress mandates proper coordination of benefits between primary payer health plans and even enacted a reporting requirement that, if complied with, would take Medicare out of the dark and expose the primary payer plans' liability for all unreimbursed payments. What primary payers are absolutely prohibited from doing is to lurk in the dark and allow CMS to pick up the tab without a prompt reimbursement.

38. With prescription drug coverage, USAA and Caremark refuse to coordinate benefits with public programs such as Medicare and Medicaid. USAA and Caremark's refusal to coordinate benefits results in Medicare being the only payer for prescription drugs that should be covered by USAA's large group health plan.

**THE REVERSE FALSE CLAIM**

39. "In a reverse false claims suit, the defendant's action does not result in improper payment by the government to the defendant, but instead results in no payment to the government when a payment is obligated." *United States ex rel. Bain v. Ga. Gulf Corp.*, 386 F.3d 648, 653 (5th Cir. 2004).

40. One of the FCA's provisions, the "reverse-false-claim" provision, prohibits improper retention of government property, including not paying money that should have been paid to the government:

**(a) Liability for certain acts.**

**(1)** In general. Subject to paragraph (2), any person who—

> **(G)** knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or <u>knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government,</u>

> is liable to the United States Government for a civil penalty of not less than $5,000 and not more than $10,000, as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990 (28 U.S.C. 2461 note; Public Law 104-410), plus 3 times the amount of damages which the Government sustains because of the act of that person.

31 U.S.C. § 3729(a)(1)(G). (Emphasis is added).

41. The knowing concealment or knowing and improper avoidance or decrease of an obligation to pay or transmit money or property to the United States Government is known as a reverse false claim. 31

U.S.C. § 3729(a)(1)(G). The reverse false claim provision prohibits the improper retention of government property, including not paying money that should have been paid to the United States Government.

42. Mr. Bruff has uncovered that: a. when a USAA disabled employee is enrolled in its large group health plan; b. if that employee is also a Medicare Part D beneficiary; c. then USAA's large group health plan knowingly refuses to coordinate benefits; d. so that when the employee presents his prescription to a pharmacy; e. Caremark's submission of a claim in real time is rejected by the USAA large group health plan; f. so that the only payer available to the pharmacy is CMS; g. so CMS pays for the prescription medication; h. USAA knowingly sloughs off its drug payment obligations to Medicare and Medicaid; and i. after conditional payments are made by CMS, USAA never steps up to reimburse Medicare and Medicaid as it is obligated to do.

43. In 2016, Mr. Bruff first began working for USAA as a software engineer.

44. USAA is an insurance agency founded in 1922 that currently serves millions of people in the military community, including active duty military, veterans, and their families.

45. Mr. Bruff is the adult disabled child of a social security recipient. At all times material hereto, Mr. Bruff received Social Security Disability benefits. Specifically, Mr. Bruff has Autism and Cerebral Palsy. As such, Mr. Bruff received both Medicare and Medicaid, which means he is enrolled in Part D and Extra Help.

46. Part D is Medicare's prescription drug coverage. Extra Help is a program within Part D that helps beneficiaries who have limited resources and income with monthly premiums, annual deductibles, and co-pays related to prescription drug coverage.

47. As an employee of USAA, Mr. Bruff also has coverage through USAA's large group health plan.

48. The USAA large group health plan's prescription drug coverage is administered by Caremark, a pharmacy benefits manager or PBM. A PBM is a third-party administrator that manages prescription drug benefits for health insurance plans, large employers, and other payers.

49. As a PBM, Caremark was also responsible for administering Mr. Bruff's Part D prescription drugs. Whenever Mr. Bruff would fill his prescriptions, it was Caremark who processed the payments.

50. With prescription drug coverage USAA and Caremark refuse to coordinate benefits with public programs such as Medicare and Medicaid.

51. USAA and Caremark's refusal to coordinate benefits results in Medicare being the only available payer for prescription drug coverage that should be covered by the USAA large group health plan.-and results in pharmacies being unable to place USAA in the primary payer position with respect to Medicare, Medicaid or any other Governmental Program.

52. USAA and Caremark's practices thus result in CMS paying large sums of money that USAA should be paying under federal law.

53. Mr. Bruff first discovered the lack of coordination between USAA, Caremark, and CMS regarding his drug coverage a few months after he started at USAA on August 22, 2016. Then, Mr. Bruff found out that USAA does not coordinate benefits for anyone who has both private insurance through USAA and public healthcare.

54. Mr. Bruff has uncovered that this failure to coordinate is not a glitch but rather a feature of USAA's large group health plan. Mr. Bruff raised this issue with USAA's HR, stating that he believed it violated federal law and could constitute Medicare fraud since USAA was making the United States Government pay for prescription drugs it should have paid for.

55. In response, Mr. Bruff was told in clear terms by USAA's HR that USAA and Caremark do not coordinate prescription medication coverage for Medicare enrollees with CMS and that employees enrolled with USAA's large group health plan should not seek reimbursement of prescription drug costs paid by Medicare or Medicaid.

56. Accordingly, the prescriptions themselves were not run through USAA's insurance at all because USAA refuses coordination. Attached hereto as **Exhibit A** is a screen shot showing that prescriptions paid by CMS are not even submitted to USAA.

57. USAA ultimately agreed to fix the issue and coordinate care for Mr. Bruff, but failed to do it for any other employee in a similar position. There are hundreds of plan members impacted just at USAA alone.

58. In January 2021, Mr. Bruff became depressed and took FMLA leave. When he did so, USAA and Caremark once again flipped his coverage attempting to designate itself as the secondary payer after Medicare. However, USAA never informed Medicare of this issue. That lead to both insurers claiming to be secondary and the complete suspension of payment for all medical services and prescription drugs needed by Mr. Bruff during that time.

59. Mr. Bruff again brought this issue up to USAA HR, providing legal information and links showing that USAA is primary.

60. Mr. Bruff has uncovered that to date, neither USAA nor Caremark has repaid Medicare for any drug claims that Medicare conditionally paid for Mr. Bruff. Further Caremark has never sought reimbursement from USAA to CMS.

61. Prescription drug claims have to be processed and paid in real time because the patient leaves the pharmacy with the prescription filled. Mr. Bruff has access to all payments and reimbursements made on account of his Medicare Part D and Medicaid benefits through his CVS Caremark account. Attached hereto as **Exhibit B** is a table generated from statements that were sent to him directly from Caremark juxtaposed with statements from his USAA large group health plan. The tables show clearly all of the payments for Mr. Bruff's prescription medications made by CMS under Part D and any reimbursements from USAA. To date, there have been no reimbursements to CMS for the conditional payments.

62. In fact, when a pharmacy attempts to submit a claim for payment of a prescription medication to the USAA large group health plan, the submission will be rejected if the patient is a Part D beneficiary. Attached hereto as Exhibit C are screenshots of Mr. Bruff's prescriptions showing that when the pharmacy tried to submit the claims to USAA, the claims were rejected at the pharmacy level. A rejection means that USAA and Caremark do not allow the claim to be processed when another payer is available – even

when that other payer is a secondary payer such as Medicare or Medicaid. This requires the pharmacy to request and accept payment from Medicare or Medicaid.

63. The fact that USAA can so easily coordinate payment with CMS shows that USAA can do the same for every other similar employee and stop defrauding Medicare and Medicaid.

64. Indeed, Caremark makes coordination of benefits extremely easy by allowing its clients to elect whether or not to turn on a flag that requires coordination of benefits. By offering this option, Caremark knows that if a company turns off its flag, it will be submitting claims to government programs like Medicare and Medicaid for dual eligible individuals that should be paid by the private insurance company. With regards Part D, USAA's flag is always turned off.

65. Mr. Bruff's situation where he has both employer insurance and public coverage is not uncommon. If an employer's large group health plan is not coordinating benefits with CMS, then Medicare and Medicaid, the payer of last resort under federal law, is improperly paying for coverage the large group health plan should pay for.

66. USAA and Caremark's refusal to coordinate prescription drug coverage with public programs also results in Medicaid being essentially billed twice for services. Here is how that happens. Forty-nine states have a program called the Health Insurance Premium Payment program or HIPP. Under that program Medicaid will pay the premiums for employer sponsored health insurance if one of the family members is on Medicaid and one of the family members has an employer plan that can also cover the person with Medicaid. If there is no coordination of benefits, which is how USAA operates, then Medicaid is both paying for the employer insurance premiums that should cover prescription drugs *and* for the prescription drugs that the employer insurance plan should have paid for. That is also fraud.

67. USAA's actions defraud the United States Government of millions, if not billions of dollars.

68. This scheme extends well beyond USAA and Caremark's administration of USAA's large group health plan.

69. Specifically, all Caremark administered plans are permitted to turn on or off the flag for

coordination of benefits. By offering this option to all of its clients, Caremark enables fraud by letting providers and pharmacies present claims for payment to government programs like Medicare and Medicaid for dual eligible individuals that should be paid by the private insurance company. Many examples of this can be provided by Relator.

70. OptumRX engages in a similar practice with all of its administered plans by allowing large group health plans to determine whether to coordinate benefits with public programs. This makes it impossible for any Medicare Part D beneficiary to enroll, which means Medicare is paying for claims that should be covered by the private insurer. That is fraud.

71. Express Scripts does the same thing. For example, Express Scripts administers numerous large group health plans including Wells Fargo's prescription drug plan. According to that plan, Wells Fargo does not coordinate care with any program including Medicare Part D, Medicaid, or TRICARE. This refusal to coordinate care by Express Scripts also results in false claims. It results in fraud because it causes the United States Government to pay for care that should be covered by a private insurer.

## THE DIRECT FALSE CLAIM

72. The FCA prohibits the presentation of a fraudulent claim for payment to the United States Government:

**(b) Liability for certain acts.**

**(2)** In general. Subject to paragraph (2), any person who—

    **(A)** knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;

is liable to the United States Government for a civil penalty of not less than $5,000 and not more than $10,000, as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990 (28 U.S.C. 2461 note; Public Law 104-410), plus 3 times the amount of damages which the Government sustains because of the act of that person.

31 .S.C. § 3729(a)(1)(A).

73. Caremark's knowing presentation to CMS of claims that Caremark knew were not owed by the Medicare program because Medicare and Medicaid are secondary payers and USAA is a primary payer, constitutes false claims.

74. USAA, Caremark, OptumRX, and Express Scripts present fraudulent claims for payment to the United States Government when they knowingly cause Medicare and Medicaid to be charged for prescription drugs that should be covered by the large group health plans of the PBM's clients.

75. The estimated cost to the United States Government of the direct and reverse false claim violations of the FCA by these PBMs and large group health plans is anywhere from $2 to $4 billion. That does not include any penalties or multipliers under the FCA.

76. Defendants are liable to the United States for damages in an amount to be determined at trial, trebled, as well as a minimum civil penalty to the United States of $5,500 and up to a maximum penalty of $11,000 for each false claim.

## PRAYER FOR RELIEF

77. Relator seeks treble actual damages suffered by the United States.

78. Relator seeks a civil penalty of not less than $5,000 nor more than $10,000, which upwardly adjusted for inflation[2] equals $14,308 and $28,619, respectively, for each false statement made or claim submitted.

79. Relator seeks all costs incurred in recovering damages or penalties.

80. Relator seeks attorney fees.

81. Relator seeks pre and post judgment interest at the maximum rate allowed by law.

82. Relator seeks an award of a percentage of the damages recovered, at the maximum percentage allowed by law.

## JURY DEMAND

---

[2] https://www.federalregister.gov/documents/2024/12/30/2024-31310/civil-monetary-penalty-adjustments-for-inflation (last visited July 21, 2025).

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, the United States demands a trial by jury on all issues so triable.

WHEREFORE, premises considered, Relator respectfully prays that upon a trial on the merits that damages be awarded in the amount sought herein and for such other and further relief to which he is justly entitled whether at law or in equity.

Dated: July 21, 2025,                                                Respectfully submitted,

ATTORNEYS FOR PLAINTIFF

ARMAS BERTRAN ZINCONE
4960 SW 72nd Avenue
Suite 206
Miami, Florida 33155
Telephone 786 394 0491
alfred@armaslaw.com

By: */s/J. Alfredo Armas*
J. Alfredo Armas
(Pro hac vice Florida Bar Number: 360708)

By: */s/ Ryan H. Susman*
Ryan H. Susman,
(to be admitted Pro hac vice Florida Bar Number: 1010444
rsusman@armaslaw.com
ryanhysusman@gmail.com

AUSTIN EMPLOYMENT LAWYERS, PC.
Cameron D. Hansen
Texas Bar No. 24145047
1011 San Jacinto Blvd., Ste. 401
Austin, TX 78701
Telephone: (512) 271-5527
Facsimile: (512) 201-1263
chansen@robwiley.com

# **CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of the foregoing was served electronically using the CM/ECF filing system on July 18, 2025.

*/s/ Ryan H. Susman*