UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION
CASE NO.: 5:22-cv-593-DAE

UNITED STATES OF AMERICA *ex rel.*
CHARLES TERRENCE BRUFF,

    *Plaintiff-Relator*,

v.

USAA INSURANCE AGENCY, INC., *et al.*,

    *Defendants*.

_____/

## RELATOR'S RESPONSE IN OPPOSITION TO DEFENDANT
## UNITED SERVICES AUTOMOBILE ASSOCIATION'S MOTION TO DISMISS [D.E. 56]

The United States of America ex rel., Charles Terrence Bruff ("Mr. Bruff") opposes

the Motion to Dismiss the First Amended Complaint ("FAC") filed by the Defendant United

Services Automobile Association ("USAA") [D.E. 56] and states:

### INTRODUCTION

Mr. Bruff sets forth a scheme by USAA to violate the False Claims Act, 31 U.S.C.

§§ 3729-3733. The FAC describes how USAA knowingly conceals and improperly avoids

and decreases its obligations to pay the cost of the prescription drugs provided to its

disabled employees enrolled in USAA's large group health plan when those employees

are also Medicare Part D beneficiaries. The cost of these prescription drugs should be

paid by USAA as the "Primary Payer" pursuant to the "Disabled individuals in large group

health plans" provisions of the Medicare Secondary Payer Act ("MSP Act") (42 U.S.C. §

1395y(b)(1)(B)(i)), and, if the United States Government is improperly forced to pay

conditionally because USAA successfully evaded its primary payer obligations, payment

must be reimbursed to Medicare by USAA within sixty (60) days. That is the law.

However, USAA neither pays nor reimburses. USAA bilks Medicare and Medicaid

1

of millions of dollars by sloughing off to these government programs USAA's obligations to pay for the prescription drugs provided to its disabled employees enrolled in its large group health plan. The reverse false claim provision creates a cause of action against any person who "knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government." Accordingly, Count One of the FAC alleges that USAA's scheme violates the "reverse False Claims Act" 31 U.S.C. § 3729(a)(1)(G) because USAA "knowingly and improperly avoided or decreased an obligation to pay or transmit money to the Government." FAC ¶ 42.

Mr. Bruff is a true whistle blower. And he brought receipts. As an employee of USAA, he has uncovered that: a. when a USAA disabled employee is enrolled in its large group health plan; b. if that employee is also a Medicare Part D beneficiary; c. then USAA's large group health plan knowingly refuses to coordinate benefits; d. so that when the employee presents his prescription to a pharmacy; e. Caremark's submission of a claim in real time is rejected by the USAA large group health plan; f. so that the only payer available to the pharmacy is CMS; g. so CMS pays for the prescription medication; and h. after conditional payments are made by CMS, USAA never steps up to reimburse Medicare and Medicaid as it is obligated to do. *Id.* ¶ 42.

USAA has moved to dismiss the FAC. As explained below, USAA's various arguments fail. The FAC easily passes muster under Fed. R. Civ. P. 12(b)(6) and 9(b). The FAC satisfies all applicable pleading requirements and states valid claims under the False Claims Act. The FAC provides sufficient particularity under Rule 9(b) by detailing USAA's specific fraudulent conduct, identifying the statutory obligations USAA violates, and explaining how this conduct results in false claims to the government. USAA's motion

to dismiss should be denied.

**II.**
Statutory And Regulatory Background

In 1980 Medicare was on the brink of insolvency. President Reagan signed the MSP Act to save it.  Prior to the MSP Act, Medicare paid for all medical treatment within its scope, leaving private insurers and group health plans to pick up any remaining expenses. Meaning Medicare was primary always. Under the MSP Act, Congress mandated that large group health plans such as USAA and not Medicare should be responsible for these medical expenses. Thus 42 U.S.C. § 1395y (b)(1)(B)(i) provides as follows:

> **(B)** Disabled individuals in large group health plans.
>
> **(i)** In general. A large group health plan (as defined in clause (iii)) may not take into account that an individual (or a member of the individual's family) who is covered under the plan by virtue of the individual's current employment status with an employer is entitled to benefits under this title [42 USCS §§ 1395 et seq.] under section 226(b) [42 USCS § 426(b)].

In short, Congress intended to transfer the financial burden of healthcare provided to disabled employees such as the Relator to a large group health plan funded by the employer such as USAA's group health plan[1]. *See Waters v. Farmers Texas* County *Mut. Ins. Co*, 9 F.3d 397, 399-400 (5th Cir. 1993)("The Medicare Secondary Payer statute, 42 U.S.C. § 1395y(b), makes Medicare the secondary payer to group health insurance, workers' compensation, and automobile and liability insurance. Group health insurance, workers' compensation, and automobile and liability insurance are to be the primary payers of medical costs for Medicare beneficiaries."). "Under current law, Medicare is the

---

[1] A large group health plan is a group health plan offered by or contributed to by an employer with 100 or more employees. *See* 42 U.S.C. § 1395y(b)(1)(B)(iii); and 26 U.S.C. § 5000(b)(1).

secondary payer where services are covered by: . . .6. Large group health plans (plans of one or more employers where at least one of the employers has 100 or more full or part-time employees) in the case of a disabled individual whose coverage is based on his or her current employment or on the current employment of a family member." 59 FR 4285.

Mr. Bruff receives Medicare Part D benefits. *Id.* at ¶ 27. Part D is Medicare's prescription drug coverage. As an employee of USAA he is also enrolled in USAA's group health plan. *Id*. Accordingly, under the MSP Act, USAA may not take into consideration that Mr. Bruff receives Medicare benefits. As regards payment for Mr. Bruff's medication, USAA's group health plan is primary and Medicare and Medicaid are secondary payers.

Even though Medicare is prohibited from paying for prescription drugs when a group health plan is primary, the law allows Medicare and Medicaid to make <u>conditional</u> payments in order to alleviate the cash flow burden on providers, pharmacies, and for the benefit of its enrollees. 42 U.S.C. § 1395y(b)(2)(A)(ii)); 42 U.S.C. § 1395y(b)(2)(B)(i). *See also Cochran v. U.S. Health Care Fin. Admin.,* 291 F.3d 775, 777 (11th Cir. 2002)("In order to accommodate its beneficiaries, however, Medicare does make conditional payments for covered services, even when another source may be obligated to pay, if that other source is not expected to pay promptly.")

When Medicare makes a conditional payment, a primary payer such as USAA is obligated to reimburse Medicare for the conditional payment within 60 days. 42 U.S.C.§ 1395y(b)(2)(B)(ii) ("[A] primary plan . . . shall reimburse the appropriate Trust Fund for any payment made by the Secretary under this subchapter with respect to an item or service if it is demonstrated that such primary plan has or had a responsibility to make

payment with respect to such item or service."). The law defines a "primary plan" as, among others, "a group health plan or large group health plan, . . ." 42 U.S.C. § 1395y(b)(2)(A). *See also Waters v. Farmers Texas* County *Mut. Ins. Co*, 9 F.3d 397, 399-400 (5th Cir. 1993)("The federal statute expressly provides that any payment of medical costs by Medicare for which private insurance is the primary payer is conditioned upon reimbursement from the insurer or any recipient of the insurance proceeds. 42 U.S.C.A. § 1395y(b)(2)(B)(i).") And this requirement is triggered upon demonstration of responsibility and mandates that the primary plan reimburse Medicare <u>on its own initiative</u>. 42 U.S.C. § 1395y(b)(2)(B)(ii).

Primary plans, like USAA, are required to seek out and provide material information regarding the underlying primary payer situation to Medicare. See 42 U.S.C. § 1395y(b)(8)(A)-(C); 42 § C.F.R. 411.25(a)-(c); 59 Fed. Reg. 4287. "42 CFR 411.25 requires a third-party payer to notify HCFA when it learns that Medicare has made conditional primary payment for items or services for which the third party payer has made or should have made primary payment." 59 FR 4285, 4286. In this way, the statutory and regulatory framework anticipates that material information is in the primary plan's unique possession. Accordingly, primary payers like USAA are required to provide "notice about primary payment responsibility and information about the underlying MSP situation" to the Medicare payer. 42 C.F.R. § 411.25; 59 Fed. Reg. 4285 (Jan. 31, 1994).

Medicare's inability to discover liability for unreimbursed conditional payments is well-documented. As the Eleventh Circuit Court of Appeals put it, "[w]hen Medicare pays . . . it <u>is paying 'in the dark'</u>—it does not know, and *cannot* know, whether someone else will pay." *United States v. Baxter Int'l, Inc*., 345 F.3d 866, 901

5

(11th Cir. 2003) (internal quotes omitted) (emphasis in the original). "Between two sources of coverage, the insurer that pays second is in the superior position to prevent an erroneous or misdirected payment. The first payer can avoid such an outcome only by refusing to pay at all. Congress foreclosed that option in 42 U.S.C. §§ 1395y(b)(2)(A) and (b)(2)(B) by providing for Medicare to pay first where payment from the primary insurer was not reasonably forthcoming. *Id.* at 901.

This is why Congress mandates proper coordination of benefits between primary health insurers and even enacted a reporting requirement that, if complied with, takes Medicare out of the dark and exposes primary payers' liability for all unreimbursed payments. What primary payers are absolutely prohibited from doing is to lurk in the dark and allow Medicare to pick up the tab without a prompt reimbursement.

Congress subsequently further amended the MSP Law by passing the PAID Act. See Pub. L. No. 116-215, Title III, § 1302, 134 Stat 1041, 1045 (Dec. 11, 2020). The Government now tells a primary plan specifically whether a Medicare beneficiary is enrolled under a Medicare Prescription Drug (Part D) program so that there can be no misunderstanding of when USAA is primary. The PAID Act further facilitates what primary plans were already statutorily obligated to do: investigate Medicare conditional payments and provide for appropriate reimbursement.

The requirement that a primary payer identify itself as primary addresses the reality that Medicare and Medicaid are at a recognized informational disadvantage in identifying primary payers. Proper compliance with the MSP Act should lead to tremendous savings for the Medicare program. This is especially so where large group health plan coverage is available. As Mr. Bruff has shown, "[w]ith prescription drug coverage, USAA and

6

Caremark refuse to coordinate benefits with public programs such as Medicare and Medicaid. USAA and Caremark's refusal to coordinate benefits results in Medicare being the primary payer for care that should be covered by the USAA GHP." *Id.* at ¶ 38.

Mr. Bruff has brought the receipts. He has identified: an employer; a large group health plan that knowingly sloughs off its drug payment obligations to Medicare; a disabled employee enrolled in both the large group health plan and Medicare; actual payments by Medicare and Medicaid for prescription medications; and the utter failure by the primary payer group health plan to reimburse Medicare and Medicaid. This is the essence of a reverse false claim. "In a reverse false claims suit, the defendant's action does not result in improper payment by the government to the defendant, but instead results in no payment to the government when a payment is obligated." *United States ex rel. Bain v. Ga. Gulf Corp.*, 386 F.3d 648, 653 (5th Cir. 2004).

The facts uncovered by Mr. Bruff and alleged in the FAC show a deliberate refusal by USAA to pay in the first instance and then, after Medicare makes a conditional payment, to identify itself as a primary payer and reimburse Medicare for the conditional payments. The facts recited in the FAC must be taken as true at the pleading stage. *See Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 556, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007); *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009).

III.
Factual Background

USAA is an insurance agency founded in 1922 that currently serves millions of people in the military community, including active-duty military, veterans, and their families. FAC at ¶ 44. In 2016, Mr. Bruff first began working for USAA as a software

7

engineer. *Id*. at ¶ 43. As an employee of USAA, Mr. Bruff is enrolled in USAA's large GHP. *Id*. at ¶ 47. USAA's prescription drug program is administered by Caremark. *Id*. at ¶¶ 6 and 48. USAA has more than 100 employees, which makes it a large GHP. *See* 42 U.S.C. § 1395y(b)(1)(B)(iii); 26 U.S.C. § 5000(b)(1). *Id.* at ¶¶ 47-48.

Mr. Bruff is the adult disabled child of a social security recipient. Due to disability, Mr. Bruff received social security benefits and received both Medicare and Medicaid. *Id*. at ¶ 45. Specifically, Mr. Bruff has Autism and Cerebral Palsy. As such, Mr. Bruff received both Medicare and Medicaid, which means he is enrolled in Part D and Extra Help. *Id*. at ¶¶ 45-46. Part D is Medicare's prescription drug coverage. *Id*. at ¶ 46. Extra Help is a program within Part D that helps beneficiaries who have limited resources and income with monthly premiums, annual deductibles, and co-pays related to prescription drug coverage. *Id*. Thus, Mr. Bruff is covered by both, Medicare and USAA's large group health plan. *Id*. at ¶¶ 43-48.

The USAA large group health plan's prescription drug coverage is administered by Caremark, a pharmacy benefits manager or PBM. *Id*. at ¶ 48. A PBM is a third-party administrator that manages prescription drug benefits for health insurance plans, large employers, and other payers. *Id*. As a PBM, Caremark was also responsible for administering Mr. Bruff's Part D prescription drugs. *Id*. at ¶ 49. Whenever Mr. Bruff would fill his prescriptions, it was Caremark who processed the payments. *Id*. With prescription drug coverage USAA and Caremark refuse to coordinate benefits with public programs such as Medicare and Medicaid. *Id*. at ¶ 50.

USAA and Caremark's refusal to coordinate benefits results in Medicare being the only available payer for prescription drug coverage that should be covered by the

USAA large group health plan –and results in pharmacies being unable to place USAA in the primary payer position with respect to Medicare, Medicaid or any other Governmental Program. *Id*. at ¶ 51. USAA and Caremark's practices thus result in CMS paying large sums of money that USAA should be paying under federal law. *Id*. at ¶ 52.

Mr. Bruff first discovered the lack of coordination between USAA, Caremark, and CMS regarding his drug coverage a few months after he started at USAA on August 22, 2016. *Id*. at ¶ 53. Then, Mr. Bruff found out that USAA does not coordinate benefits for anyone who is both enrolled in its GHP and Medicare. *Id*. Mr. Bruff has uncovered that this failure to coordinate is not a glitch but rather a feature of USAA's large group health plan. *Id*. at ¶ 54. Mr. Bruff raised this issue with USAA's HR, stating that he believed it violated federal law and could constitute Medicare fraud since USAA was making the United States Government pay for prescription drugs USAA should have paid for. *Id*. In response, Mr. Bruff was told in clear terms by USAA's HR that USAA and Caremark do not coordinate prescription medication coverage for Medicare enrollees with CMS, and that employees enrolled with USAA's large group health plan should not seek reimbursement of prescription drug costs paid by Medicare or Medicaid. *Id*. at ¶ 55. Accordingly, the prescriptions themselves were not run through USAA's insurance at all because USAA refuses coordination. *Id*. at ¶ 56. Exhibit A to the FAC shows that prescriptions paid by CMS are not even submitted to USAA.

USAA ultimately agreed to fix the issue and coordinate care for Mr. Bruff, but failed to do it for any other employee in a similar position. *Id*. at ¶ 57. There are hundreds of plan members impacted just at USAA alone. *Id*.

In January 2021, Mr. Bruff became depressed and took FMLA leave. *Id*. at ¶ 58. When he did so, USAA and Caremark once again flipped his coverage attempting to designate itself as the secondary payer after Medicare. *Id*. However, USAA never informed Medicare of this issue. *Id*. That lead to both insurers claiming to be secondary and the complete suspension of payment for all medical services and prescription drugs needed by Mr. Bruff during that time. *Id*. Mr. Bruff again brought this issue up to USAA HR, providing legal information and links showing that USAA is primary. *Id*. at ¶ 59. Mr. Bruff has uncovered that to date, neither USAA nor Caremark has repaid Medicare for any drug claims that Medicare conditionally paid on Mr. Bruff's behalf. *Id*. at ¶ 60. Further Caremark has never sought reimbursement from USAA to CMS. *Id*.

Prescription drug claims have to be processed and paid in real time because the patient leaves the pharmacy with the prescription filled. *Id*. at ¶ 61. Mr. Bruff has access to all payments and reimbursements made on account of his Medicare Part D and Medicaid benefits through his CVS Caremark account. *Id*. Attached to the FAC as Exhibit B is a table generated from statements that were sent to Mr. Bruff directly from Caremark juxtaposed with statements from his USAA large group health plan. *Id*. The tables show clearly that all of the payments for Mr. Bruff's prescription medications were made by CMS under Part D and that there have been no reimbursements from USAA to CMS. *Id*. To date, there have been no reimbursements to CMS for the conditional payments. *Id*.

In fact, USAA has engineered a system that when a pharmacy attempts to submit a claim for payment of a prescription medication to the USAA group health plan, the submission will be rejected if the patient is also Part D beneficiary. *Id*. at ¶ 62. Exhibit C attached to the FAC shows that when the pharmacy tried to submit the claims to USAA,

the claims were rejected at the pharmacy level. *Id*. A rejection means that USAA and Caremark do not allow the claim to be processed when another payer is available – even when that other payer is a secondary payer such as Medicare or Medicaid. *Id*. This requires the pharmacy to request and accept payment from Medicare or Medicaid. *Id*.

The fact that USAA can so easily coordinate payment with CMS shows that USAA can do the same for every other similar employee and stop defrauding Medicare and Medicaid. *Id*. at ¶ 63. Indeed, Caremark makes coordination of benefits extremely easy by allowing its clients to elect whether or not to turn on a flag that requires coordination of benefits. *Id*. at ¶ 64. By offering this option, Caremark knows that if a company turns off its flag, it will by default submit claims to government programs like Medicare and Medicaid that should be paid by the primary payer group plan. *Id*. With regards Part D, USAA's flag is always turned off. *Id*.

Mr. Bruff's situation where he has both employer insurance and public coverage is not uncommon. *Id*. at ¶ 65. If USAA's large group health plan is not coordinating benefits with CMS, then Medicare and Medicaid, the payer of last resort under federal law, is improperly paying for coverage the large group health plan should pay for. *Id*. USAA refuses to coordinate benefits under its GHP's prescription drug plan with Medicare and Medicaid, even though USAA should be paying primary or before Medicare and Medicaid. See 42 U.S.C. § 1395y(b). *Id*. at ¶ 66. The upshot is that Medicare and Medicaid pay for Mr. Bruff's medication even though the USAA Group Health Plan is primary and even though the USAA Group Health Plan should advise Medicare and Medicaid of its primary payer status. *Id*. The damage that USAA's denial of benefits and denial of coordination of benefits causes is substantial and must be

stopped. *Id*. at ¶¶ 60-67. To date, neither USAA nor Caremark has repaid Medicare for any drug claims that Medicare erroneously paid for Mr. Bruff. *Id*. at ¶¶ 60-61. Further Caremark has never sought Medicare reimbursement from the USAA GHP. *Id*. at ¶¶ 9 and 60-69.

The FAC alleges that USAA knowingly conceals and improperly avoids and decreases its obligations to pay the cost of the prescription drugs provided to its employees enrolled in USAA's large group health plan when those employees are also Medicare Part D beneficiaries. This allegation ties the false conduct directly to USAA's obligation to pay under the MSP Act. The FAC identifies the specific fraudulent conduct (refusal to coordinate benefits), the process by which it occurs (rejection of pharmacy claims when Medicare Part D coverage exists), and ties these false representations to actual claims for payment. The FAC details how "when a USAA disabled employee is enrolled in its large group health plan" and "is also a Medicare Part D beneficiary," USAA's plan knowingly refuses to coordinate benefits so that "CMS pays for the prescription medication" while "USAA never steps up to reimburse Medicare and Medicaid." *Id.* at ¶ 42.

### IV.
### STANDARD OF REVIEW

When deciding whether to grant the defendants' 12(b)(6) motion, the district court must view the complaint "in the light most favorable to the [United States] and with every doubt resolved in [its] behalf." *Cornish v. Correctional Servs. Corp*., 402 F.3d 545, 548 (5th Cir. 2005); *see also Whitehead v. Zurich Am. Ins. Co.,* 348 F.3d 478, 480 (5th Cir. 2003). In order for a 12(b)(6) motion to be granted, the complaint must plead facts that are insufficient "to state a claim for relief that is plausible on its face." *Bell Atl. Corp. v.*

*Twombly*, 550 U.S. 544, 570 (2007).

All that is required is for the complaint to "to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009) (*quoting Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678.

> While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do. Factual allegations must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact).

*United States ex rel. Cecilia Young v. Kindred Healthcare, Inc.*, No. 1:18-cv-00806-RP, 2022 U.S. Dist. LEXIS 6601, at *6 (W.D. Tex. Jan. 13, 2022) (quoting *Twombly*, 550 U.S. at 555 (cleaned up).

Because FRCP Rule 9(b) applies to the pleading of False Claims Act cases, any False Claims Act complaint must "state with particularity the circumstances constituting fraud." However, the Fifth Circuit both acknowledges that the False Claims Act is remedial and that it serves a salutary purpose which should not be stymied. The "'time, place, contents, and identity' standard is not a straitjacket for Rule 9(b). Rather, the rule is context specific and flexible and must remain so to achieve the remedial purpose of the False Claim Act. We reach for a workable construction of Rule 9(b) with complaints under the False Claims Act; that is, one that effectuates Rule 9(b) without stymieing legitimate efforts to expose fraud." *United States ex rel. Grubbs v. Ravikumar Kanneganti*, 565 F.3d

180, 190 (5th Cir. 2009).

Indeed, even before the Fifth Circuit in 2009 decided *Grubbs*, multiple district courts within the Circuit had established a line of precedents in FCA cases that had "relaxed Rule 9(b)'s pleading standard where the alleged fraud occurred over an extended period of time and consists of numerous acts." *U.S. ex rel. Foster v. Bristol-Myers Squibb Co.,* 587 F.Supp.2d 805, 821 (E.D.Tex. 2008). *See also U.S. ex rel. Davis v. Lockheed Martin Corp.,* U.S.Dist. LEXIS 120730 *3 (N.D.Tex. 2010), *U.S. ex rel. Lam v. Tenet Healthcare Corp*., 481 F.Supp.2d 689, 697 (W.D.Tex. 2007), *U.S. ex rel. King v. Alcon Labs, Inc.*, 232 F.R.D. 568, 570 (N.D.Tex. 2005), and *U.S. ex rel. Johnson v. Shell Oil Co*., supra. USAA's conduct as alleged certainly qualifies as having occurred over a long period and through multiple acts. In fact, it is ongoing.

When properly applied in such cases, Rule 9(b) "supplements but does not supplant" Rule 8(a)'s notice pleading." *United States ex rel. Grubbs v. Ravikumar Kanneganti,* 565 F.3d 180, 186 (5" Cir. 2009). It should be applied in any particular case only to the extent necessary to provide defendants "with fair notice of the plaintiffs' claims." *Id.* at 190. A common-law-based standard requiring plaintiffs to particularize the "time, place, contents and identity" of alleged fraudulent conduct "'is not a straitjacket for Rule 9(b)" when applied to False Claims Act complaints. *Ibid.* "Rather, the rule is context specific and flexible and must remain so to achieve the remedial purpose of the False Claims Act." *Ibid.* "And surely a procedural rule ought not be read to insist that a plaintiff plead the level of detail required to prevail at trial." *Id*. at 189.

The *Grubbs* case remains the leading Fifth Circuit case on the proper application of Rule 9(b) to FCA complaints. Because of its continuing influence, to this day in the Fifth

14

Circuit "there is no single construction of Rule 9(b) that applies in all contexts." *Id.* at 188. "Depending on the claim, a plaintiff may sufficiently 'state with particularity the circumstances constituting fraud or mistake' without including all the details of any single court-articulated standard - it depends on the elements of the claim at hand." *Ibid.*

The distinct "elements of the claim at hand" in this case involve the knowing refusal by USAA to step up and identify itself as a primary payer, lurking quietly while Medicare and Medicaid pay for medication that should be paid first by USAA, and then failing to reimburse the government for conditional secondary payments made by it.

<u>IV.</u>
<u>ARGUMENT</u>

As a threshold matter, USAA is not arguing that a false claim can never be submitted under the circumstances Relator has laid out. It is simply saying that Mr. Bruff does not show proof sufficient to establish that fraud. In contrast to that assertion, Mr. Bruff attaches the specific proofs of fraud. Exhibit A is comprised of two sources—both of which came from Caremark's internal documenting system. The first was a list of drug claims from USAA dating back to 2017. The second was Medicare Drug claims dating back to 2017. Both sources involve the concurrent coverage for medications of the Relator from 2017 to 2022.

**A. <u>USAA Had an Obligation to Pay the Government</u>**

A large GHP is a group health plan offered by or contributed to by an employer with 100 or more employees. *See* 42 U.S.C. § 1395y(b)(1)(B)(iii); 26 U.S.C. § 5000(b)(1). Under § 1395y(b)(2), the GHP is the primary payer. As the payer of last resort, Medicaid pays not only after large GHP's but after Medicare payments as well. 42 U.S.C. 1396, *et seq*. USAA has more than 100 employees, making it a large GHP that pays primary under

the MSP Act. Complaint at ¶ 27. Around the time when Mr. Bruff started to work at USAA in 2016 he was also a Medicare beneficiary. Id. at ¶ 34. Therefore, USAA should have and must have been coordinating Mr. Bruff's medical benefits with Medicare since then. That has not been the case.

The FAC asserts that USAA, as Mr. Bruff's GHP, failed to coordinate benefits with his Medicare and Medicaid insurances. FAC at ¶ 42, 50-51. Although USAA temporarily fixed this issue with regard to only Mr. Bruff, Relator has firsthand knowledge that USAA did not implement the fix to its other employees who were also dually enrolled in Medicare and their GHP. *Id*. at ¶ 57. What is more, in January of 2021, USAA undesignated itself as Mr. Bruff's primary payer in Caremark's reporting system causing a complete suspension of GHP coverage altogether. *Id*. at ¶ 58. After Mr. Bruff went back to USAA repeatedly to again fix this issue, USAA only fixed that issue with regards to Relator. *Id*. at ¶¶ 53-60. But, during the pendency of the fixes, claims were caused to be submitted to the government that were never reimbursed by USAA even though Defendants were aware of them. *Id.* at ¶¶ 42-60. The localized fraud that can be established by Relator's claims are being perpetrated on a large scale.

The False Claim Act authorizes actions by a relator in a qui tam capacity on behalf of the government. 31 U.S.C. § 3730(a)-(b). The reverse false claim provision imposes liability on defendants who "knowingly and improperly avoid or decrease an obligation to pay or transmit money or property to the Government." 31 USCS § 3729(a)(1)(G).

USAA operates a large group health plan covering over 100 employees, making it subject to the Medicare Secondary Payer Act's requirements. Under 42 U.S.C. § 1395y(b)(1)(B)(i), large group health plans may not take into account that an individual

who is covered under the plan by virtue of the individual's current employment status with an employer is entitled to benefits under Medicare. This creates a clear statutory obligation for USAA to serve as the primary payer for disabled employees' prescription drugs.

The FAC alleges that USAA systematically conceals and avoids its primary payer obligations through several specific actions. First, USAA refuses to coordinate benefits with Medicare and Medicaid, ensuring that these programs become the default payers for prescription drugs. Second, USAA maintains a flag with Caremark that could enable coordination of benefits but deliberately keeps it turned off for Part D coverage. Third, when Medicare makes conditional payments, USAA fails to reimburse these payments within the required 60-day period. This conduct fits squarely within the reverse false claim framework, where "there is no improper payment by the government to a defendant, but rather there is an improper reduction in the defendant's liability to the government." *United States ex rel. Marcy v. Rowan Co.,* 520 F.3d 384, 390 (5th Cir. 2008).

The MSP Act creates precisely this type of obligation by requiring primary plans to reimburse Medicare for conditional payments within 60 days. The FAC alleges that USAA purposely has Caremark turn off the flag that identifies USAA as a primary payer thereby concealing its obligation to pay in the first instance and then to reimburse conditional payments. These allegations establish both the existence of USAA's obligation and its knowing concealment of that obligation. The FAC provides detailed examples of USAA's systematic fraud. The complaint includes specific evidence such as screenshots showing prescription claims rejected by USAA when Medicare coverage exists, and tables documenting payments made by Medicare with no corresponding reimbursements from

17

USAA. Mr. Bruff's personal experience as a USAA employee further provides concrete examples of the fraudulent scheme. The FAC alleges that when Mr. Bruff raised concerns about USAA's failure to coordinate benefits, "he was told in clear terms by USAA's HR that USAA and Caremark do not coordinate prescription medication coverage for Medicare enrollees". The FAC alleges that USAA's fraudulent conduct is not limited to Mr. Bruff's situation but affects "hundreds of plan members impacted just at USAA alone." The complaint describes how USAA's refusal to coordinate benefits creates a systematic problem where "Medicare and Medicaid, the payer of last resort under federal law, is improperly paying for coverage the large group health plan should pay for."

USAA's reliance on *U.S. ex rel. Angelo v. Allstate Ins. Co*., 106 F.4th 441, 449 (6th Cir. 2024) is misplaced. *Angelo* dealt with alleged violations of the MSP Act by auto insurers. The relators in that case were not true whistle blowers employed by the auto insurers and they did not and could not plead fraud with particularity; they did not bring receipts.

USAA does not deny that it is the primary payer for Mr. Bruff's prescription medication. USAA is also not contesting that it changed Mr. Bruff's coverage determinations, even though they were "fixed" after being notified. Lastly, USAA is not and cannot claim that it reimbursed the Government for any damages arising from the lack of coverage issues they "fixed." "To date, neither USAA nor Caremark has repaid Medicare for any drug claims that Medicare erroneously paid for Mr. Bruff." FAC at ¶ 60. In sum, USAA knowingly conceals and improperly avoids or decreases its obligation to pay the conditional payments made by the Government.

**B. <u>Leave to Amend</u>**

Courts seek to ensure that cases are decided on their merits. To that end, amendments to pleadings ought to be allowed freely. Federal Rule of Civil Procedure 15(a) requires that leave to amend be granted freely "when justice so requires." Fed. R. Civ. P. 15(a)(2). The Fifth Circuit is particularly liberal in granting leave to amend when a complaint is first dismissed. *See Hart v. Bayer Corp.*, 199 F.3d 239, 247 n.6 (5th Cir. 2000) (noting that "[a]lthough a court may dismiss [a] claim [for failure to comply with Rule 9(b)], it should not do so without granting leave to amend, unless . . . the plaintiff has failed to plead with particularity <u>after being afforded repeated opportunities to do so</u>." (emphasis is added). Rule 15(a) provides a "strong presumption in favor of granting leave to amend" *Fin. Acquisition Partners, LP v. Blackwell*, 440 F.3d 278, 291 (5th Cir. 2006). To the extent that the Court finds any deficiency in the Complaint, the Relator prays for relief to remedy the pleading.

<u>IV.</u>
<u>CONCLUSION</u>

For the foregoing reasons, Relators respectfully requests the Court **deny** Defendant USAA's Motion in its entirety.

Dated: October 17, 2025

Respectfully submitted,

**Armas Bertran Zincone**
4960 SW 72nd Ave., Ste. 206
Miami, FL 33155
Telephone 786 394 0491

By: */s/J. Alfredo Armas*
J. Alfredo Armas
(FBN: 360708)
alfred@armaslaw.com

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that a true and correct copy of the foregoing was served electronically using the CM/ECF filing system on October 17, 2025.

*/s/ J. Alfredo Armas*