THE UNITED STATES OF AMERICA ex rel.,
CHARLES TERRENCE BRUFF,

    *Plaintiff-Relator*,

vs.                                        Case No.: 5:22-cv-593-DAE


USAA INSURANCE AGENCY, INC., *et al*.,
    *Defendants*.

_____/

### RELATOR'S RESPONSE IN OPPOSITION TO DEFENDANT OPTUMRX, INC.'S MOTION TO DISMISS (DKT. # 57)

The United States of America ex rel., Charles Terrence Bruff ("Mr. Bruff") opposes the Motion to Dismiss (Dkt. # 57) the First Amended Complaint ("FAC") (Dkt. # 48) filed by the Defendant OptumRX,Inc. ("Optum") and states:

### INTRODUCTION AND CONCISE STATEMENT OF THE REASONS FOR OPPOSITION

Mr. Bruff sets forth a scheme to violate the False Claims Act, 31 U.S.C. §§ 3729-3733 by large group health plans such as that of Defendant USAA Insurance Company ("USAA"). The FAC describes how Pharmacy Benefits Managers ("PBM"), including Optum, further that scheme by submitting false claims to the Government instead of the large group health plans even though the large group health plans are primary payers and the Government is the payer of last resort.

A PBM is a third-party administrator that manages prescription drug benefits for health insurance plans, large employers, and other payers. The FAC makes clear that, in administering payments and benefits, PBMs facilitate the large group health plans' efforts to evade their primary payment obligations. USAA knowingly conceals and improperly

avoids and decreases its obligations to pay the cost of the prescription drugs provided to its disabled employees enrolled in USAA's large group health plan when those employees are also Medicare Part D beneficiaries. The cost of these prescription drugs should be paid by USAA as the "Primary Payer" pursuant to the "Disabled individuals in large group health plans" provisions of the Medicare Secondary Payer Act ("MSP Act") (42 U.S.C. § 1395y(b)(1)(B)(i)), and, if the United States Government is improperly forced to pay conditionally because USAA successfully evaded its primary payer obligations, payment must be reimbursed to Medicare by USAA within sixty (60) days. That is the law.

However, PBMs like Optum allow these large group health plans to literally turn off a flag that identifies them as primary payers leaving only Medicare and Medicaid as payers. Optum then submits the claim for prescription medications to Medicare and Medicaid even though it knows that the group health plans are primary payers and that Medicare and Medicaid are payers of last resort.

Mr. Bruff is a true whistle blower. As an employee of USAA, he has uncovered that: a. when a disabled employee is enrolled in a large group health plan; b. if that employee is also a Medicare Part D beneficiary; c. then large group health plans knowingly refuse to coordinate benefits; d. so that when the employee presents his prescription to a pharmacy; e. Optum's submission of a claim in real time is rejected by the large group health plan; f. so that the only payer available to the pharmacy is CMS; g. so CMS pays for the prescription medication even though the large group health plan is the primary payer. FAC ¶ 42; 70.

Optum has moved to dismiss the FAC. As explained below, Optum's various arguments fail. The FAC provides sufficient particularity under Rule 9(b) by detailing the

large group health plans' specific fraudulent conduct, identifying the statutory obligations each violates, and explaining how PBMs including Optum abet this fraud by presenting false claims to the Government even though Optum knows that the large group health plans are the primary payers. Optum's motion to dismiss should be denied.

## II.
## Statutory And Regulatory Background

In 1980 Medicare was on the brink of insolvency. Congress passed the MSP Act to save it. Prior to the MSP Act, Medicare paid for all medical treatment within its scope, leaving private insurers and group health plans to pick up any remaining expenses. Meaning Medicare was primary always. Under the MSP Act, Congress mandated that large group health plans such as USAA and not Medicare should be responsible for these medical expenses. Thus 42 U.S.C. § 1395y (b)(1)(B)(i) provides as follows:

> **(B)** Disabled individuals in large group health plans.
>
> **(i)** In general. A large group health plan (as defined in clause (iii)) may not take into account that an individual (or a member of the individual's family) who is covered under the plan by virtue of the individual's current employment status with an employer is entitled to benefits under this title [42 USCS §§ 1395 et seq.] under section 226(b) [42 USCS § 426(b)].

Congress intended to transfer the financial burden of healthcare provided to disabled employees such as the Relator to a large group health plan funded by the employer such as USAA's group health plan[1]. *See Waters v. Farmers Texas* County *Mut. Ins. Co*, 9 F.3d 397, 399-400 (5th Cir. 1993)("The Medicare Secondary Payer statute, 42 U.S.C. § 1395y(b), makes Medicare the secondary payer to group health insurance, workers' compensation, and automobile and liability insurance. Group health insurance,

---

[1] A large group health plan is a group health plan offered by or contributed to by an employer with 100 or more employees. *See* 42 U.S.C. § 1395y(b)(1)(B)(iii); and 26 U.S.C. § 5000(b)(1).

workers' compensation, and automobile and liability insurance are to be the primary payers of medical costs for Medicare beneficiaries.") "Under current law, Medicare is the secondary payer where services are covered by: . . .6. Large group health plans (plans of one or more employers where at least one of the employers has 100 or more full or part-time employees) in the case of a disabled individual whose coverage is based on his or her current employment or on the current employment of a family member." 59 FR 4285.

Mr. Bruff receives Medicare Part D benefits. *Id.* at ¶ 45. Part D is Medicare's prescription drug coverage. As an employee of USAA he is also enrolled in USAA's group health plan. *Id.* at ¶ 47. Accordingly, under the MSP Act, USAA may not take into consideration that Mr. Bruff receives Medicare benefits. As regards payment for Mr. Bruff's medication, USAA's group health plan is primary and Medicare and Medicaid are secondary payers.

Even though Medicare is prohibited from paying for prescription drugs when a group health plan is primary, the law allows Medicare and Medicaid to make <u>conditional</u> payments in order to alleviate the cash flow burden on providers, pharmacies, and for the benefit of its enrollees. 42 U.S.C. § 1395y(b)(2)(A)(ii)); 42 U.S.C. § 1395y(b)(2)(B)(i). *See also Cochran v. U.S. Health Care Fin. Admin.,* 291 F.3d 775, 777 (11th Cir. 2002)("In order to accommodate its beneficiaries, however, Medicare does make conditional payments for covered services, even when another source may be obligated to pay, if that other source is not expected to pay promptly.")

When Medicare makes a conditional payment, a primary payer such as USAA is obligated to reimburse Medicare for the conditional payment within 60 days. ("[A] primary

plan . . . shall reimburse the appropriate Trust Fund for any payment made by the Secretary under this subchapter with respect to an item or service if it is demonstrated that such primary plan has or had a responsibility to make payment with respect to such item or service."). 42 U.S.C.§ 1395y(b)(2)(B)(ii). The law defines a "primary plan" as, among others, "a group health plan or large group health plan, . . ." 42 U.S.C. § 1395y(b)(2)(A). *See also Waters v. Farmers Texas* County *Mut. Ins. Co*, 9 F.3d 397, 399-400 (5th Cir. 1993)("The federal statute expressly provides that any payment of medical costs by Medicare for which private insurance is the primary payer is conditioned upon reimbursement from the insurer or any recipient of the insurance proceeds. 42 U.S.C.A. § 1395y(b)(2)(B)(i).") And this requirement is triggered upon demonstration of responsibility and mandates that the primary plan reimburse Medicare <u>on its own initiative</u>. 42 U.S.C. § 1395y(b)(2)(B)(ii).

Primary plans, like USAA, are required to seek out and provide material information regarding the underlying primary payer situation to Medicare. See 42 U.S.C. § 1395y(b)(8)(A)-(C); 42 § C.F.R. 411.25(a)-(c); 59 Fed. Reg. 4287. "42 CFR 411.25 requires a third party payer to notify HCFA when it learns that Medicare has made conditional primary payment for items or services for which the third party payer has made or should have made primary payment." 59 FR 4285, 4286. In this way, the statutory and regulatory framework anticipates that material information is in the primary plan's unique possession. Accordingly, primary payers like USAA are required to provide "notice about primary payment responsibility and information about the underlying MSP situation" to the Medicare payer. 42 C.F.R. § 411.25; 59 Fed. Reg. 4285 (Jan. 31, 1994).

Medicare's inability to discover liability for unreimbursed conditional payments is well-documented. As the Eleventh Circuit Court of Appeals put it, "[w]hen Medicare pays . . . it <u>is paying 'in the dark'</u>—it does not know, and *cannot* know, whether someone else will pay." *United States v. Baxter Int'l, Inc*., 345 F.3d 866, 901 (11th Cir. 2003) (internal quotes omitted) (emphasis in the original). "Between two sources of coverage, the insurer that pays second is in the superior position to prevent an erroneous or misdirected payment. The first payer can avoid such an outcome only by refusing to pay at all. Congress foreclosed that option in 42 U.S.C. §§ 1395y(b)(2)(A) and (b)(2)(B) by providing for Medicare to pay first where payment from the primary insurer was not reasonably forthcoming. *Id.* at 901.

This is why Congress mandates proper coordination of benefits between primary health insurers and even enacted a reporting requirement that, if complied with, takes Medicare out of the dark and exposes primary payers' liability for all unreimbursed payments. What primary payers are absolutely prohibited from doing is to lurk in the dark and allow Medicare to pick up the tab without a prompt reimbursement.

Congress subsequently further amended the MSP Law by passing the PAID Act. See Pub. L. No. 116-215, Title III, § 1302, 134 Stat 1041, 1045 (Dec. 11, 2020). The Government now tells a primary plan specifically whether a Medicare beneficiary is enrolled under a Medicare Prescription Drug (Part D) program so that there can be no misunderstanding of when USAA is primary. The PAID Act further facilitates what primary plans were already statutorily obligated to do: investigate Medicare conditional payments and provide for appropriate reimbursement.

The requirement that a primary payer identify itself as primary addresses the reality

that Medicare and Medicaid are at a recognized informational disadvantage in identifying primary payers. Proper compliance with the MSP Act should lead to tremendous savings for the Medicare program. This is especially so where large group health plan coverage is available. As Mr. Bruff has shown, "[w]ith prescription drug coverage, USAA and Caremark refuse to coordinate benefits with public programs such as Medicare and Medicaid. USAA and Caremark's refusal to coordinate benefits results in Medicare being the primary payer for care that should be covered by the USAA GHP." *Id.* at ¶¶ 7 – 8; 38. And "OptumRX engages in a similar practice with all of its administered plans by allowing large group health plans to determine whether to coordinate benefits with public programs." *Id.*at ¶ 70.

The facts uncovered by Mr. Bruff and alleged in the FAC show that the PBMs including Optum allow large group health plans to conceal their primary payer status by simply turning off a flag that identifies them as payers. By default the claim is then submitted to the only identified payer – CMS. The facts recited in the FAC must be taken as true at the pleading stage. *See Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 556, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007); *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009).

III.<br>Factual Background

USAA is an insurance agency founded in 1922 that currently serves millions of people in the military community, including active-duty military, veterans, and their families. FAC at ¶ 44. In 2016, Mr. Bruff first began working for USAA as a software engineer. *Id*. at ¶ 43. As an employee of USAA, Mr. Bruff is enrolled in USAA's large GHP. *Id*. at ¶ 47. USAA's prescription drug program is administered by Caremark. *Id*. at

¶ 48. USAA has more than 100 employees, which makes it a large GHP. *See* 42 U.S.C. § 1395y(b)(1)(B)(iii); 26 U.S.C. § 5000(b)(1). *Id.* at ¶ 25.

Mr. Bruff is the adult disabled child of a social security recipient. Due to disability, Mr. Bruff received social security benefits and received both Medicare and Medicaid. *Id.* at ¶ 45. Specifically, Mr. Bruff has Autism and Cerebral Palsy. As such, Mr. Bruff received both Medicare and Medicaid, which means he is enrolled in Part D and Extra Help. *Id.* at ¶ 45. Part D is Medicare's prescription drug coverage. *Id.* at ¶ 46. Extra Help is a program within Part D that helps beneficiaries who have limited resources and income with monthly premiums, annual deductibles, and co-pays related to prescription drug coverage. *Id.* Thus, Mr. Bruff is covered by both, Medicare and USAA's large group health plan.

Optum is a pharmacy benefits manager or PBM. *Id.* at ¶ 20. A PBM is a third-party administrator that manages prescription drug benefits for health insurance plans, large employers, and other payers. *Id.* at ¶48. PBMs are responsible for administering Mr. Bruff's Part D prescription drugs. *Id.* at ¶ 49. Whenever Mr. Bruff would fill his prescriptions, the PBM administering USAA's plan (Caremark) processed the payments. *Id.* Mr. Bruff has uncovered that prescription drug claims have to be processed and paid in real time because the patient leaves the pharmacy with the prescription filled. *Id.* at ¶ 61.

Mr. Bruff has access to all payments and reimbursements made on account of his Medicare Part D and Medicaid benefits through his CVS Caremark account. *Id.* Attached to the FAC as Exhibit B is a table generated from statements that were sent to Mr. Bruff directly from Caremark juxtaposed with statements from his USAA large group

health plan. *Id*. The tables show clearly that all of the payments for Mr. Bruff's prescription medications were made by CMS under Part D and that there have been no reimbursements from USAA to CMS. *Id*. To date, there have been no reimbursements to CMS for the conditional payments. *Id*.

Exhibit C attached to the FAC shows that when the pharmacy tried to submit the claims to USAA, the claims were rejected at the pharmacy level. *Id*. A rejection means that the large group health plan and the PBM do not allow the claim to be processed when another payer is available – even when that other payer is a secondary payer such as Medicare or Medicaid. *Id*. This requires the pharmacy to request and accept payment from Medicare or Medicaid. *Id*.

PBMs make coordination of benefits extremely easy by allowing their large group health plan clients to elect whether or not to turn on a flag that requires coordination of benefits. *Id*. at ¶ 64; 70. By offering this option, Optum knows that if a company turns off its flag, the pharmacy must by default submit claims to government programs like Medicare and Medicaid even though the cost of the medication should be paid by the primary payer group plan. *Id*.

Mr. Bruff's situation where he is both enrolled in his employer's large group health plan and public coverage is not uncommon. *Id*. at ¶ 65.

### IV.
### STANDARD OF REVIEW

When deciding whether to grant the defendants' 12(b)(6) motion, the district court must view the complaint "in the light most favorable to the [United States] and with every doubt resolved in [its] behalf." *Cornish v. Correctional Servs. Corp*., 402 F.3d 545, 548 (5th Cir. 2005); *see also Whitehead v. Zurich Am. Ins. Co.,* 348 F.3d 478, 480 (5th Cir.

2003). In order for a 12(b)(6) motion to be granted, the complaint must plead facts that are insufficient "to state a claim for relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).

All that is required is for the complaint to "to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009) (*quoting Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678.

> While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do. Factual allegations must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact).

*United States ex rel. Cecilia Young v. Kindred Healthcare, Inc.*, No. 1:18-cv-00806-RP, 2022 U.S. Dist. LEXIS 6601, at *6 (W.D. Tex. Jan. 13, 2022) (quoting *Twombly*, 550 U.S. at 555 (cleaned up).

Because FRCP Rule 9(b) applies to the pleading of False Claims Act cases, any False Claims Act complaint must "state with particularity the circumstances constituting fraud." However, the Fifth Circuit both acknowledges that the False Claims Act is remedial and that it serves a salutary purpose which should not be stymied. The "'time, place, contents, and identity' standard is not a straitjacket for Rule 9(b). Rather, the rule is context specific and flexible and must remain so to achieve the remedial purpose of the False Claim Act. We reach for a workable construction of Rule 9(b) with complaints under

the False Claims Act; that is, one that effectuates Rule 9(b) without stymieing legitimate efforts to expose fraud." *United States ex rel. Grubbs v. Ravikumar Kanneganti*, 565 F.3d 180, 190 (5th Cir. 2009).

Even before the Fifth Circuit in 2009 decided *Grubbs*, multiple district courts within the Circuit had established a line of precedents in FCA cases that had "relaxed Rule 9(b)'s pleading standard where the alleged fraud occurred over an extended period of time and consists of numerous acts." *U.S. ex rel. Foster v. Bristol-Myers Squibb Co.,* 587 F.Supp.2d 805, 821 (E.D.Tex. 2008). *See also U.S. ex rel. Davis v. Lockheed Martin Corp.,* U.S.Dist. LEXIS 120730 *3 (N.D.Tex. 2010), *U.S. ex rel. Lam v. Tenet Healthcare Corp.*, 481 F.Supp.2d 689, 697 (W.D.Tex. 2007), *U.S. ex rel. King v. Alcon Labs, Inc.*, 232 F.R.D. 568, 570 (N.D.Tex. 2005), and *U.S. ex rel. Johnson v. Shell Oil Co.*, supra. USAA's conduct as alleged certainly qualifies as having occurred over a long period and through multiple acts. In fact, it is ongoing.

When properly applied in such cases, Rule 9(b) "supplements but does not supplant" Rule 8(a)'s notice pleading." *United States ex rel. Grubbs v. Ravikumar Kanneganti,* 565 F.3d 180, 186 (5" Cir. 2009). It should be applied in any particular case only to the extent necessary to provide defendants "with fair notice of the plaintiffs' claims." *Id.* at 190. A common-law-based standard requiring plaintiffs to particularize the "time, place, contents and identity" of alleged fraudulent conduct "'is not a straitjacket for Rule 9(b)" when applied to False Claims Act complaints. *Ibid.* "Rather, the rule is context specific and flexible and must remain so to achieve the remedial purpose of the False Claims Act." *Ibid.* "And surely a procedural rule ought not be read to insist that a plaintiff plead the level of detail required to prevail at trial." *Id*. at 189.

The *Grubbs* case remains the leading Fifth Circuit case on the proper application of Rule 9(b) to FCA complaints. Because of its continuing influence, to this day in the Fifth Circuit "there is no single construction of Rule 9(b) that applies in all contexts." *Id.* at 188. "Depending on the claim, a plaintiff may sufficiently 'state with particularity the circumstances constituting fraud or mistake' without including all the details of any single court-articulated standard - it depends on the elements of the claim at hand." *Ibid.*

The distinct "elements of the claim at hand" in this case involve the knowing submission of false claims to the Government when Optum well knows that the large group health plan is primary.

**IV.**
**ARGUMENT**

### A. Large Group Health Plans have a Primary Obligation to Pay the Cost of Prescription Medication for Their Enrollees

A large group health plan is one offered by or contributed to by an employer with 100 or more employees. *See* 42 U.S.C. § 1395y(b)(1)(B)(iii); 26 U.S.C. § 5000(b)(1). Under § 1395y(b)(2), the large group health plan is the primary payer. As the payer of last resort, Medicaid pays not only after large group health plans but after Medicare payments as well. 42 U.S.C. 1396, *et seq*. A large group health plan pays primary under the MSP Act. The FAC asserts that large group health plans are abetted in their failure to coordinate benefits with Medicare and Medicaid coverage by PBMs allowing them to lurk in the dark by simply turning off a flag that would identify them as a payer. FAC at ¶ 69; 70.

The False Claim Act authorizes actions by a relator in a qui tam capacity on behalf of the government. 31 U.S.C. § 3730(a)-(b). To establish a violation of the FCA, the relator

must prove that: (1) there was a false statement or fraudulent course of conduct; (2) made or carried out with the requisite scienter; (3) that was material; and (4) that caused the Government to pay or forfeit monies due (*i.e.*, that involved a claim). *United States ex rel. Hueseman v. Pro. Compounding Centers of Am., Inc.*, 664 F. Supp. 3d 722, 738 (W.D. Tex. 2023) (citing *United States ex rel. Longhi v. Lithium Power Techs., Inc.*, 575 F.3d 458, 467 (5th Cir. 2009) (citing 31 U.S.C. 3729(a))).

The FAC alleges that USAA systematically conceals and avoids its primary payer obligations through several specific actions. First, USAA refuses to coordinate benefits with Medicare and Medicaid, ensuring that these programs become the default payers for prescription drugs. Second, USAA maintains a flag with Caremark that could enable coordination of benefits but deliberately keeps it turned off for Part D coverage. Third, when Medicare makes conditional payments, USAA fails to reimburse these payments within the required 60-day period. Caremark then submits the claim to Medicare even though it well knows that USAA is the primary payer. Optum does the same thing when it administers its clients' large group health plans.

This conduct fits squarely within the false claim framework. "The FCA applies to anyone who 'knowingly assist[s] in causing' the Government to pay claims grounded in fraud." *United States v. Marlin Med. Sols., LLC*, No. SA-21-CV-160-OLG, 2025 U.S. Dist. LEXIS 38508, at *20 (W.D. Tex. Mar. 3, 2025). The FAC alleges that Optum submits false claims to the Government which it knows that its large group health plan customers should pay. Instead, Optum allows them to lurk in the dark at the expense of Medicare. These allegations establish both the existence of the large group health plans' obligations and Optum's knowing concealment of that obligation.

**B. <u>Leave to Amend</u>**

Courts seek to ensure that cases are decided on their merits. To that end, amendments to pleadings ought to be allowed freely. Federal Rule of Civil Procedure 15(a) requires that leave to amend be granted freely "when justice so requires." Fed. R. Civ. P. 15(a)(2). The Fifth Circuit is particularly liberal in granting leave to amend when a complaint is first dismissed. *See Hart v. Bayer Corp.*, 199 F.3d 239, 247 n.6 (5th Cir. 2000) (noting that "[a]lthough a court may dismiss [a] claim [for failure to comply with Rule 9(b)], it should not do so without granting leave to amend, unless . . . the plaintiff has failed to plead with particularity <u>after being afforded repeated opportunities to do so</u>." (emphasis is added). Rule 15(a) provides a "strong presumption in favor of granting leave to amend," *Fin. Acquisition Partners, LP v. Blackwell*, 440 F.3d 278, 291 (5th Cir. 2006). To the extent that the Court finds any deficiency in the First Amended Complaint, the Relator prays for relief to remedy the pleading.

**<u>IV.</u>**
**<u>CONCLUSION</u>**

For the foregoing reasons, Relator respectfully requests the Court **deny** Defendant Optum's Motion in its entirety.

Dated: October 17, 2025

Respectfully submitted,

**Armas Bertran Zincone**
4960 SW 72nd Ave., Ste. 206
Miami, FL 33155
Telephone 786 394 0491

By: */s/J. Alfredo Armas*
J. Alfredo Armas
(FBN: 360708)
alfred@armaslaw.com

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing was served electronically using the CM/ECF filing system on October 17, 2025.

*/s/ J. Alfredo Armas*