**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF TEXAS**
**SAN ANTONIO DIVISION**

UNITED STATES OF AMERICA *ex rel.*,
CHARLES TERRENCE BRUFF,

      Plaintiff-Relator,

vs.                                No.: 5:22-cv-593-DAE

USAA INSURANCE AGENCY, INC.,
CAREMARK RX, LLC, OPTUMRX,INC.,
and EXPRESS SCRIPTS,INC.,

      <u>Defendants.</u>

**RELATOR'S RESPONSE IN OPPOSITION TO DEFENDANT**
<u>**CAREMARK RX, L.L.C.'S MOTION TO DISMISS (DKT. # 86)**</u>

The United States of America *ex rel.*, Charles Terrence Bruff ("Mr. Bruff") opposes the Motion to Dismiss (Dkt. # 86) the First Amended Complaint ("FAC") (Dkt. # 48) filed by Defendant Caremark RX, L.L.C. ("Caremark") and states:

**<u>INTRODUCTION</u>**

Mr. Bruff sets forth a scheme to violate the False Claims Act, 31 U.S.C. §§ 3729-3733. The FAC describes how Caremark, as the pharmacy benefit manager ("PBM") for USAA's large group health plan, both participates in and furthers a scheme by which prescription drug claims for dual-eligible beneficiaries are systematically submitted to the Government rather than to USAA's private plan, even though USAA is the legally mandated primary payer under the Medicare Secondary Payer Act ("MSP Act"). Caremark then fails to reimburse the Government for the conditional payments Medicare was forced to make in USAA's stead. Caremark raises four arguments for dismissal. All four fail.

*First*, Caremark argues that the MSP Act's private right of action forecloses False Claims Act ("FCA") liability. That because Mr. Bruff has suffered an injury as a Medicare participant, he

1

cannot act as a relator. The MSP Act's private right of action permits individual beneficiaries to recover their own damages. It does not speak to — let alone displace — qui tam enforcement under the FCA for fraudulent conduct that injures the United States Treasury. The two statutes serve complementary but distinct purposes, and courts have rejected that displacement argument.

*Second*, Caremark contends that Relator has failed to plead a reverse FCA claim under Rule 9(b). This argument misreads the FAC and misapplies the governing standard. The FAC describes with particularity the scheme (categorical refusal to coordinate benefits for dual-eligible employees), the mechanism (Caremark's administration of the "coordination of benefits" flag which it allows USAA to disable), the consequence (Medicare making conditional payments that USAA never reimburses), and documentary corroboration through three exhibits. Caremark's unique role as the PBM that controls claims adjudication on both the USAA private plan side and the Medicare Part D side gives it direct, real-time knowledge of every instance where a claim is routed to Medicare instead of to the primary payer. That is exactly the kind of knowing concealment and improper avoidance the reverse FCA was designed to reach.

*Third*, Caremark argues that the presentment claim fails. To the contrary, the FAC alleges that Caremark submits prescription drug claims to Medicare Part D plans knowing those claims should have been submitted to and paid by USAA's group health plan as primary payer. Those are false claims for payment presented to the Government.

*Fourth*, Caremark argues the FCA's qui tam provisions are unconstitutional. This argument is foreclosed by binding Fifth Circuit precedent. *Riley v. St. Luke's Episcopal Hosp.*, 252 F.3d 749 (5th Cir. 2001) (*en banc*); *United States ex rel. Gomez v. Koman Constr., LLC*, No. EP-20-CV-252-KC, 2025 U.S. Dist. LEXIS 164904, at *55-56 (W.D. Tex. Aug. 22, 2025). Caremark's Motion to Dismiss should be denied in its entirety.

2

**STATUTORY AND REGULATORY BACKGROUND**

In 1980, facing a Medicare program on the brink of insolvency, Congress passed the MSP Act to transfer the primary financial burden of healthcare for employed disabled individuals from the federal fisc to their employers' group health plans. Prior to the MSP Act, Medicare paid for all medical treatment within its scope, functioning as the primary insurer for all beneficiaries regardless of other coverage. The MSP Act made Medicare a secondary payer.

Under the MSP Act's large-group-health-plan provision, a large group health plan "may not take into account that an individual (or a member of the individual's family) who is covered under the plan by virtue of the individual's current employment status with an employer is entitled to benefits under [Medicare] under section 226(b)." 42 U.S.C. § 1395y(b)(1)(B)(i). As the Fifth Circuit has recognized, "The Medicare Secondary Payer statute, 42 U.S.C. § 1395y(b), makes Medicare the secondary payer to group health insurance, workers' compensation, and automobile and liability insurance. Group health insurance, workers' compensation, and automobile and liability insurance are to be the primary payers of medical costs for Medicare beneficiaries." *Waters v. Farmers Texas County Mut. Ins. Co.*, 9 F.3d 397, 399-400 (5th Cir. 1993).

Because pharmacies must dispense prescriptions in real time and cannot wait for primary-payer disputes to be resolved, the MSP Act permits Medicare to make <u>conditional</u> payments to ensure that beneficiaries receive their medications. 42 U.S.C. § 1395y(b)(2)(B)(i). "In order to accommodate its beneficiaries, however, Medicare does make conditional payments for covered services, even when another source may be obligated to pay, if that other source is not expected to pay promptly." *Cochran v. U.S. Health Care Fin. Admin.*, 291 F.3d 775, 777 (11th Cir. 2002).

When Medicare makes a conditional payment, the primary plan is obligated to reimburse Medicare <u>on its own initiative</u> within 60 days. "[A] primary plan . . . shall reimburse the appropriate

Trust Fund for any payment made by the Secretary under this subchapter with respect to an item or service if it is demonstrated that such primary plan has or had a responsibility to make payment with respect to such item or service." 42 U.S.C. § 1395y(b)(2)(B)(ii). *See also Waters*, 9 F.3d at 399-400.

The MSP Act also imposes affirmative reporting and disclosure obligations on primary plans. Primary payers are required to seek out and provide material information about the underlying primary payer situation to Medicare. *See* 42 U.S.C. § 1395y(b)(8)(A)-(C); 42 C.F.R. § 411.25(a)-(c); 59 Fed. Reg. 4285, 4286-87 (Jan. 31, 1994) ("42 CFR 411.25 requires a third-party payer to notify HCFA when it learns that Medicare has made conditional primary payment for items or services for which the third-party payer has made or should have made primary payment."). Congress subsequently reinforced these obligations with the PAID Act, Pub. L. No. 116-215, § 1302, 134 Stat. 1041, 1045 (Dec. 11, 2020). Importantly, as demonstrated by the fact that it billed Medicare, Caremark had actual knowledge that Mr. Bruff is a Medicare recipient.

This framework reflects a deliberate congressional choice: Medicare pays *"in the dark"* — it does not know, and cannot know, whether someone else will pay. *United States v. Baxter Int'l, Inc.*, 345 F.3d 866, 901 (11th Cir. 2003). The primary plan, by contrast, has unique knowledge of its own coverage decisions. Congress therefore placed the obligation of initiating reimbursement squarely on the primary plan — not on Medicare to hunt it down.

### **FACTUAL BACKGROUND**

Mr. Bruff has worked for USAA as a software engineer since 2016. FAC ¶ 43. He has Autism and Cerebral Palsy and, as a result, receives both Medicare and Medicaid benefits including Medicare Part D prescription drug coverage and Extra Help. *Id.* ¶ 45. As a USAA employee, he was also enrolled in USAA's large group health plan. *Id.* ¶ 47. USAA employs more

4

than 100 employees and is therefore a "large group health plan" under 42 U.S.C. § 1395y(b)(1)(B)(iii) and 26 U.S.C. § 5000(b)(1), making it the legally mandated primary payer for Mr. Bruff's prescription drugs. *Id.* ¶ 25.

Caremark is not a peripheral participant. Caremark is the PBM that administers USAA's large group health plan pharmacy benefits — meaning Caremark controls the real-time adjudication of every prescription drug claim submitted through that plan. FAC ¶¶ 48-49. At the same time, Caremark separately administers pharmacy benefits for certain federal insurance plans, including Medicare Part D plans. *Id.* ¶ 49. Caremark therefore sits at the intersection of both payment streams. When a pharmacy submits a prescription claim, Caremark processes the claim: if it routes to USAA's plan, Caremark adjudicates it as a private-plan claim; if it routes to Medicare Part D, Caremark adjudicates it as a federal claim. Caremark knows in real time which payer is primary and which claim is being charged to the Government instead.

Caremark offers plan sponsors a "coordination of benefits" flag that, if enabled, automatically ensures that claims are routed to the appropriate primary payer before being submitted to Medicare or Medicaid. FAC ¶¶ 64, 69. Caremark allows plan sponsors such as USAA to elect whether to enable this flag. *Id.* ¶ 64. With respect to USAA's large group health plan and Part D beneficiaries, the flag is always turned off. *Id.* ¶ 69. By offering plan sponsors the option to disable coordination, and administering the plan with the flag disabled, Caremark knows that when a dual-eligible beneficiary fills a prescription the claim will be submitted to Medicare, not USAA.

When Mr. Bruff or any other dual-eligible USAA employee presents a prescription at the pharmacy, Caremark rejects the claim under USAA's plan because the beneficiary is also a Medicare Part D enrollee. FAC ¶ 42. The pharmacy is then left with only one available payer:

Medicare. Medicare pays conditionally. Neither USAA nor Caremark then reimburses Medicare for these conditional payments. *Id.* ¶ 60.

Mr. Bruff raised the coordination failure directly with USAA's HR and was told in explicit terms that "USAA and Caremark do not coordinate prescription medication coverage for Medicare enrollees with CMS," and that employees should not seek reimbursement of prescription drug costs paid by Medicare or Medicaid. FAC ¶¶ 54-55. Although USAA agreed to temporarily fix the issue for Mr. Bruff individually, it subsequently "flipped his coverage" back to treating Medicare as primary — without informing Medicare. *Id.* ¶¶ 57-58. This caused a complete suspension of all coverage for Mr. Bruff during that period. *Id.*

The FAC attaches three exhibits. Exhibit A is a Medicare prescription drug summary showing that CMS paid for prescriptions that were never submitted to USAA. Exhibit B is a detailed table — generated from statements sent to Mr. Bruff directly from Caremark — showing that all payments for Mr. Bruff's prescription medications were made by CMS under Part D, and that there have been no reimbursements from USAA to CMS for any of these conditional payments. Exhibit C is a screenshot showing a pharmacy's attempt to submit a claim to USAA being rejected. FAC ¶¶ 56, 60-62; Exs. A-C.

## STANDARD OF REVIEW

When deciding whether to grant a motion to dismiss, the district court must view the complaint "in the light most favorable to the [United States] and with every doubt resolved in [its] behalf." *Cornish v. Correctional Servs. Corp.*, 402 F.3d 545, 548 (5th Cir. 2005). To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the

plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678.

Rule 9(b)'s heightened pleading standard requires plaintiffs to "state with particularity the circumstances constituting fraud," but it is "not a straitjacket." *United States ex rel. Grubbs v. Kanneganti*, 565 F.3d 180, 190 (5th Cir. 2009). A relator satisfies Rule 9(b) by detailing an "actually submitted false claim" *or* by "alleging particular details of a scheme to submit false claims paired with reliable indicia that lead to a strong inference that claims were actually submitted." *Id.* at 190.

Moreover, district courts within the Fifth Circuit have "relaxed Rule 9(b)'s pleading standard where the alleged fraud occurred over an extended period of time and consists of numerous acts." *U.S. ex rel. Foster v. Bristol-Myers Squibb Co.*, 587 F. Supp. 2d 805, 821 (E.D. Tex. 2008); *see also U.S. ex rel. Lam v. Tenet Healthcare Corp.*, 481 F. Supp. 2d 689, 697 (W.D. Tex. 2007). The conduct alleged here has been ongoing since at least 2016. Accordingly, "a court should hesitate to dismiss a complaint under Rule 9(b) if the court is satisfied that: (1) the defendant has been made aware of the circumstances for which it will have to present a defense at trial and (2) plaintiff has substantial prediscovery evidence of those facts." *Id.*

## ARGUMENT

## I. THE MSP ACT DOES NOT FORECLOSE RELATOR'S FCA CLAIMS

Caremark contends that because the MSP Act contains a private right of action for individual beneficiaries, it displaces any FCA claim arising from MSP Act violations. This is wrong as a matter of law.

The MSP Act's private right of action states: "There is established a private cause of action for damages (which shall be in an amount double the amount otherwise provided) in the case of a

primary plan which fails to provide for primary payment (or appropriate reimbursement) in accordance with paragraphs (1) and (2)(A)." 42 U.S.C. § 1395y(b)(3)(A). This provision allows *individual beneficiaries* to recover their *own* doubled damages when a primary plan fails them. It says nothing about qui tam enforcement on behalf of the United States, nothing about fraud against the Treasury, and nothing about FCA liability.

The displacement argument requires showing that a specific remedial scheme common to the same plaintiff demonstrates Congress's intent to foreclose all other remedies. *City of Rancho Palos Verdes v. Abrams*, 544 U.S. 113, 121 (2005). But the MSP Act's private right of action and the FCA address fundamentally different harms to different legal persons and serve fundamentally different purposes:

> **MSP Act private right of action:** Allows an *individual beneficiary* to sue the primary plan for her *own* loss — i.e., out-of-pocket costs the plan should have covered. The remedy is double the beneficiary's own damages. The MSP Act is not a qui tam statute; a private plaintiff cannot bring claims on behalf of the United States. *See Stalley ex rel. United States v. Mountain States Health All.*, 644 F.3d 349, 351 (6th Cir. 2011).

> **FCA qui tam action:** Allows a relator to bring claims on behalf of the United States for fraud against the government — specifically, for causing Medicare to pay claims it should not have paid (presentment) or for improperly concealing or avoiding an obligation to reimburse Medicare (reverse FCA). The remedy is treble damages *to the United States*, plus civil penalties. The relator receives a share of the government's recovery — not her own personal damages.

These are not duplicative remedies for the same harm but rather they are distinct remedies for distinct harms suffered by distinct parties, *i.e.*, the United States and Mr. Bruff. Caremark's argument that the MSP Act's individual-beneficiary remedy forecloses the government's own fraud-recovery mechanism has no support in the text or structure of either statute. Indeed, courts considering the same argument have consistently rejected it. *See United States ex rel. Aranda v. Community Psychiatric Centers of Okla., Inc.*, 945 F. Supp. 1485, 1489 (W.D. Okla. 1996) (noting

that FCA and separate statutory scheme can coexist when they serve different purposes and protect different parties). If Caremark's logic were accepted the FCA would be gutted. No person with standing who suffered statutory damages could act as a relator. This is especially ridiculous when applied to the MSP Act. A primary payer could defraud the government of billions of dollars in Medicare conditional payments, and the United States would have no FCA remedy because the only remedy is a beneficiary's ability to sue for her own doubled out-of-pocket costs. Congress plainly did not intend such an absurd result.

Caremark twists the Court's holding in *City of Rancho Palos Verdes* into a pretzel to make it agree with Caremark's argument. That case addressed whether plaintiffs could use a general cause of action (§ 1983) to circumvent a statute's "more restrictive private remedy" where Congress had created a comprehensive remedial scheme for the same harm <u>and the same parties</u>. 544 U.S. at 121. Here, the MSP Act and the FCA are not in tension because they provide remedies to different parties (individual beneficiaries vs. the United States), for different harms (personal coverage failures vs. fraud on the Treasury), and for different statutory awards (doubled individual damages vs. treble government damages and penalties). Neither statute is more restrictive than the other when applied to the harms it is designed to remedy.

In addition, Caremark's reading of *Stalley v. Orlando Reg'l Healthcare Sys.*, 524 F.3d 1229 (11th Cir. 2008) is wrong. Caremark asserts that the 11th Circuit held that "[t]he MSP Act therefore does not permit plaintiffs to sue as 'private attorneys general to sue on behalf of the United States . . .'" Nonsense. The actual holding in *Stalley* is that the relator lacked standing precisely because, unlike Mr. Bruff, he was not a Medicare recipient and had therefore not suffered an injury under the MSP Act: "Since we conclude that Stalley lacks standing because he has no injury in fact and

9

because the MSP is not a qui tam statute, the district court lacked subject matter jurisdiction over the complaint, and it had no power to render a judgment on the merits." *Id* at 1235.

Finally, the government's own enforcement prerogatives under the MSP Act — including its right to seek double damages from primary payers, *see* 42 U.S.C. § 1395y(b)(2)(B)(iii) — coexist with the FCA. Caremark offers no coherent account of why qui tam enforcement under the FCA should be treated differently from the government's own direct enforcement. The MSP Act does not foreclose FCA liability.

## II. RELATOR ADEQUATELY PLEADS A REVERSE FCA CLAIM

The reverse FCA imposes liability on any person who "knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government." 31 U.S.C. § 3729(a)(1)(G). The FAC alleges that Caremark and USAA systematically conceal and avoid primary payer obligations through several specific actions. Mr. Bruff's personal experience as a USAA employee further provides concrete examples of the fraudulent scheme. The FAC alleges that when Mr. Bruff raised concerns about USAA's failure to coordinate benefits, "he was told in clear terms by USAA's HR that USAA and Caremark do not coordinate prescription medication coverage for Medicare enrollees." The upshot is that the Government pays a debt that it does not owe. This conduct fits squarely within the reverse false claim framework, where "there is no improper payment by the government to a defendant, but rather there is an improper reduction in the defendant's liability to the government." United States ex rel. Marcy v. Rowan Co., 520 F.3d 384, 390 (5th Cir. 2008).

### A. The Amended Complaint Satisfies Rule 9(b)

Caremark argues that the FAC fails Rule 9(b)'s particularity requirement. But the FAC alleges *particular details of a scheme* paired with reliable indicia — including three documentary

exhibits from Caremark's own systems — that lead to a strong inference that false claims were actually submitted. *Grubbs*, 565 F.3d at 190. This is precisely the alternative path to Rule 9(b) compliance recognized by the Fifth Circuit.

The FAC pleads the following specific facts:

**Who:** USAA (the primary plan) and Caremark (the PBM administering USAA's plan and controlling claim adjudication). FAC ¶¶ 7-9, 48-49, 64.

**What:** USAA's group health plan categorically refuses to coordinate prescription drug benefits for employees who are also Medicare Part D beneficiaries. Caremark, as the PBM controlling claim adjudication, rejects claims submitted by pharmacies under USAA's plan whenever the patient is a dual-eligible beneficiary. Caremark allows USAA to keep the "coordination of benefits" flag disabled, knowing this causes Medicare to be charged for claims USAA should pay. FAC ¶¶ 42, 51, 53-56, 62, 64, 69.

**When:** Ongoing since at least 2016, when Mr. Bruff began employment with USAA and discovered the coordination failure. FAC ¶¶ 43, 53. The FMLA episode in January 2021 documents a second specific instance where USAA and Caremark reverted to treating Medicare as primary. *Id.* ¶ 58.

**Where:** At the point-of-sale pharmacy level, in real time. Every time a dual-eligible USAA employee fills a prescription, Caremark processes the claim and routes it to Medicare instead of to USAA's plan. FAC ¶¶ 61-62, Ex. C.

**How:** By (1) keeping the coordination-of-benefits flag disabled in Caremark's system, causing pharmacies to be unable to bill USAA as primary; (2) rejecting claims submitted under USAA's plan whenever a beneficiary has concurrent Medicare Part D coverage; (3) thereby forcing pharmacies to submit those claims to Medicare as the only available payer; and (4) failing to reimburse Medicare for the conditional payments after the fact. FAC ¶¶ 42, 54-56, 60, 62, 64, 69.

The FAC also attaches three documentary exhibits that corroborate these allegations. Exhibit B is a table generated from Caremark's own statements showing that all payments for Mr. Bruff's prescriptions were made by CMS under Part D, with no reimbursements from USAA. Exhibit C shows a pharmacy's claim being rejected under Caremark's system. These are not "self-made" exhibits offered without foundation — they are records generated from Caremark's own

11

internal systems, sent directly to Mr. Bruff, and reflecting the very pattern of non-coordination Relator alleges. FAC ¶¶ 61-62, Exs. B-C.

Caremark contends these allegations do not satisfy Rule 9(b) because Relator does not identify the specific drugs, pharmacies, claim amounts, and individual claim numbers at issue. But this argument conflates the specificity required at trial with what is required at the pleading stage. *Grubbs*, 565 F.3d at 189 ("surely a procedural rule ought not be read to insist that a plaintiff plead the level of detail required to prevail at trial"). Where a scheme operates categorically — i.e., where every claim by every dual-eligible USAA beneficiary is automatically routed to Medicare — the scheme itself is the fraud, and pleading the scheme with particularity is sufficient. *See U.S. ex rel. Foster v. Bristol-Myers Squibb Co.*, 587 F. Supp. 2d 805, 821 (E.D. Tex. 2008).

Caremark also accuses Relator of "group pleading" by referring to "USAA and Caremark" collectively. This argument fails because the FAC *does* specify Caremark's distinct role. Unlike USAA, which is the plan sponsor, Caremark is the entity that (1) controls the claims adjudication system; (2) administers the "coordination of benefits" flag; (3) processes and adjudicates claims on behalf of USAA's plan; and (4) simultaneously administers Medicare Part D plans, giving it direct knowledge of which payer is primary. FAC ¶¶ 48-49, 64, 69. Caremark's own systems generated Exhibit B — the very evidence of non-payment. Caremark is not a passive bystander; it is the mechanism through which the scheme operates.

Caremark's reliance on *United States ex rel. Angelo v. Allstate Insurance Co.*, 106 F.4th 441 (6th Cir. 2024), is misplaced. In *Angelo*, the relators were strangers to the scheme. They were not employees of the defendant insurance company, had no access to internal records, could not identify specific coverage determinations, and had no documentary corroboration. Here, Mr. Bruff brought the receipts. He is a USAA employee who raised this issue directly with USAA's HR,

received an explicit confirmation that the non-coordination is policy, observed the scheme operating on his own claims over years, and has documentary evidence from Caremark's own systems. The FAC provides the kind of "exemplars" that the *Angelo* court found lacking.

**B. The Amended Complaint Adequately Alleges an Obligation**

Caremark argues that Relator has not alleged a present "obligation" to reimburse the government because (1) CMS has not "demonstrated" that Caremark must reimburse and (2) any obligation is contingent on a discretionary waiver decision by the Secretary. Neither argument withstands scrutiny.

The FCA defines "obligation" as "an established duty, whether or not fixed, arising from . . . statute or regulation." 31 U.S.C. § 3729(b)(3) (emphasis added). The MSP Act imposes a statutory reimbursement obligation directly: "[A] primary plan . . . *shall* reimburse the appropriate Trust Fund for any payment made by the Secretary under this subchapter with respect to an item or service if it is demonstrated that such primary plan has or had a responsibility to make payment." 42 U.S.C. § 1395y(b)(2)(B)(ii) (emphasis added). The use of the mandatory "shall" establishes this as a statutory duty — exactly the type of obligation the FCA reaches. Congress desired the FCA to be given a broad reading and "intended [it] to reach all types of fraud, without qualification, that might result in financial loss to the Government. In its present form the Act is broadly phrased to reach any person who makes or causes to be made 'any claim upon or against" the United States, or who makes a false 'bill, receipt, . . . claim, . . . affidavit, or deposition' for the purpose of 'obtaining or aiding to obtain the payment or approval of' such a false claim. In the various contexts in which questions of the proper construction of the Act have been presented, the Court has consistently refused to accept a rigid, restrictive reading, even at the time when the statute imposed criminal sanctions as well as civil." *United States v. Neifert-White Co.*, 390 U.S. 228, 88

13

S. Ct. 959, 19 L. Ed. 2d 1061 (1968)(emphasis is supplied). The False Claims Act encompasses claims made against the United States for money and/or property where such claims have caused or are capable of causing financial loss to the Government. *United States v. Cohn,* 270 U.S. 339, 345-46, 70 L. Ed. 616, 46 S. Ct. 251 (1926).

The FAC alleges facts demonstrating that USAA "has or had a responsibility" to pay for Mr. Bruff's prescriptions: USAA is a large group health plan; Mr. Bruff is a dual-eligible disabled employee whose coverage arises from his employment; and Caremark's own records (Exhibit B) document that Medicare paid conditionally for claims that USAA was obligated to pay as primary. These allegations establish that USAA's primary-payer responsibility is demonstrated — not merely speculative — for the specific claims reflected in the FAC's exhibits.

Caremark's argument that no obligation exists until CMS formally "demonstrates" liability through "a judgment" or formal proceeding gets the statute backwards. Section 1395y(b)(2)(B)(ii) does not require a formal governmental proceeding before the obligation arises — it provides that liability is *established* (and thus can be *demonstrated* in litigation) by "other means" including "a judgment" or "other means." A relator can demonstrate the primary plan's responsibility through evidence of coverage, the payments made by Medicare, and the absence of reimbursement. This is precisely what Exhibit B shows. The very purpose of the FCA reverse-claim provision is to permit recovery where a defendant is avoiding a duty to pay. Requiring a prior formal governmental determination before the FCA obligation even arises would render the reverse FCA toothless in the MSP context.

Caremark's waiver argument also fails. The fact that the Secretary *may* waive reimbursement "in the best interests of the program," 42 U.S.C. § 1395y(b)(2)(B)(v), does not make the underlying obligation contingent or non-existent. The obligation arises by statute. The

Secretary's discretionary waiver authority — like the government's discretionary power to settle any claim — does not negate the obligation's existence before the waiver is exercised. *See United States ex rel. Marcy v. Rowan Cos.*, 520 F.3d 384, 391 (5th Cir. 2008) (distinguishing between statutory obligations that exist independently and government's discretionary enforcement decisions). There is no allegation or evidence that the Secretary has exercised or even considered exercising a waiver here.

As for Caremark specifically: Caremark argues it is not a "primary plan" and therefore bears no reimbursement obligation under § 1395y(b)(2)(B)(ii). But the MSP Act imposes obligations not only on the primary plan but also on "an entity that receives payment from a primary plan." 42 U.S.C. § 1395y(b)(2)(B)(iii). As the PBM administering USAA's plan, Caremark processes and receives the fruits of plan operations. Moreover, the reverse FCA's reach is not limited to the entity that literally owes the government money — it extends to anyone who "knowingly conceals or knowingly and improperly avoids or decreases" an obligation that *exists*. Caremark's systematic administration of the claims-rejection scheme is precisely the conduct that conceals and avoids USAA's reimbursement obligation.

## C. The Amended Complaint Adequately Alleges Scienter

The FCA defines "knowingly" to include actual knowledge, deliberate ignorance, or reckless disregard. 31 U.S.C. § 3729(b)(1). Caremark argues that the FAC contains no "specific facts" showing Caremark knew of any reimbursement obligation. To the contrary, the FAC alleges direct, actual knowledge from multiple sources.

Caremark is the PBM simultaneously administering (1) USAA's private-plan pharmacy benefits and (2) Medicare Part D pharmacy benefits. FAC ¶ 49. In this dual capacity, Caremark sees every claim that is submitted: it knows when a claim is rejected under USAA's plan because

15

the beneficiary is a Medicare enrollee, and it knows when that same claim is then submitted to and paid by Medicare. This is not constructive or imputed knowledge — it is *actual*, *real-time* knowledge arising from Caremark's own systems and operations.

The FAC further alleges that Mr. Bruff was told explicitly by USAA's HR that "USAA and Caremark do not coordinate prescription medication coverage for Medicare enrollees with CMS." FAC ¶ 55. This is not a vague reference to company-wide policy — it is a specific, contemporaneous representation that Caremark *does not coordinate* as a matter of deliberate practice. The HR representative identified Caremark by name as a knowing participant. An HR representative's explicit acknowledgment that the company's PBM does not coordinate benefits is plainly sufficient to establish scienter at the pleading stage.

The "coordination of benefits" flag is another powerful indicator of knowing conduct. FAC ¶ 64. Caremark designed and administers this flag. It knows that when the flag is disabled for Part D beneficiaries, Medicare will be charged for claims USAA should pay. Caremark does not simply provide a neutral service — it actively structures its system to permit plan sponsors to opt out of their legal coordination obligations. The decision to design and maintain that opt-out functionality, and to administer USAA's plan with the flag disabled, reflects deliberate institutional knowledge and choice.

Caremark's scienter argument also conflates the pleading requirement with the proof requirement. Rule 9(b) permits scienter to be pled generally. *See* Fed. R. Civ. P. 9(b) ("Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally."). The FAC's factual allegations — Caremark's dual role, the explicit HR admission, the coordination flag, and the documented pattern of Medicare being billed for USAA's obligations — are more than sufficient to support an inference of knowing conduct.

**D. The Amended Complaint Adequately Alleges Concealment or Improper Avoidance**

Contrary to Caremark's contentions, the FAC alleges affirmative conduct, not a mere omission. Caremark does not simply fail to write a check. Caremark takes affirmative steps to maintain the scheme:

(1) **Active claim rejection:** Caremark affirmatively rejects prescription claims submitted under USAA's plan when the beneficiary is a Medicare enrollee. This is not a passive failure — it is an active adjudication decision communicated in real time to pharmacies. FAC ¶ 62, Ex. C.

(2) **Maintaining the disabled flag:** Caremark affirmatively administers the USAA plan with the coordination-of-benefits flag disabled, preventing automatic routing to the correct primary payer. This is an ongoing, affirmative system configuration choice. FAC ¶¶ 64, 69.

(3) **Routing claims to Medicare:** By rejecting the USAA-plan claim and leaving Medicare as the only identified payer, Caremark affirmatively channels payments to the Government that should flow through USAA's plan. FAC ¶ 42.

(4) **Failure to report:** 42 C.F.R. § 411.25 requires third-party payers to notify HCFA when they learn that Medicare has made conditional primary payment for items the payer should have paid. Caremark, as USAA's plan administrator with direct knowledge of every such payment, is positioned to make this report and does not do so. FAC ¶ 60; 59 Fed. Reg. 4285, 4286.

These affirmative steps satisfy the "concealment" and "improper avoidance" prongs. Caremark's conduct is not a "garden-variety" failure to pay — it is a designed, systematic mechanism for ensuring that Medicare bears costs that USAA is legally required to bear.

### III. RELATOR ADEQUATELY PLEADS A PRESENTMENT CLAIM

**A. The Presentment Claim Satisfies Rule 9(b)**

The FAC alleges that Caremark "knowingly present[ed] . . . a false or fraudulent claim for payment" when it submitted prescription drug claims to Medicare Part D plans knowing that those claims should have been submitted to and paid by USAA as the primary payer. FAC ¶ 72.

17

Caremark's dual role is critical here. Caremark administers both USAA's private plan and Medicare Part D plans. FAC ¶ 49. Every time a dual-eligible USAA employee fills a prescription, Caremark processes the claim through its systems. Having rejected the claim under USAA's plan (step 1), Caremark then submits it to Medicare Part D (step 2). In performing step 2 — submitting the claim to Medicare — Caremark is "presenting" a claim to the Government. And it does so knowing (from step 1) that USAA's plan is the primary payer and that Medicare is only a secondary payer for this beneficiary. That is a false claim: a claim for payment the government does not owe because another party is primary.

The FAC alleges the scheme with particularity: who (Caremark), what (submitting dual-eligible beneficiaries' prescription claims to Medicare Part D), when (at the point-of-sale since at least 2016), where (at the pharmacy, through Caremark's adjudication system), and how (by rejecting the USAA-plan claim and routing it to Medicare as the only available payer). Exhibit B documents specific instances. Exhibit C shows a specific rejection. This satisfies *Grubbs*.

## B. The Presentment Claim Satisfies the Elements of § 3729(a)(1)(A)

*Falsity.* Caremark argues there is no false statement because Caremark did not explicitly certify MSP Act compliance when submitting claims to Medicare. But the implied certification doctrine does not require an explicit statement of compliance. It reaches claims that *"by [their] nature . . . impl[y] compliance with relevant . . . statutory . . . requirements."* *Escobar*, 579 U.S. at 190. When Caremark submits a prescription drug claim to a Medicare Part D plan, it is implicitly representing that Medicare is the appropriate payer for this claim — i.e., that there is no higher-priority primary payer. The entire structure of the Medicare Part D program is premised on coordination of benefits rules that make Medicare secondary to employer group health plans. By

18

submitting a claim to Medicare Part D for a dual-eligible employee of a large group health plan, Caremark is implicitly representing that no primary plan is available. That representation is false.

*Scienter.* As discussed in Section II.C above, Caremark has actual knowledge that USAA's group health plan is primary for dual-eligible employees. It rejects the USAA-plan claim in the same transaction in which it submits the Medicare claim. The scienter for the reverse FCA claim and the presentment claim arise from the same facts.

*Materiality.* Caremark's argument confuses Medicare's administrative flexibility with the materiality of the underlying false representation. The question for materiality is whether the false representation had "a natural tendency to influence, or be capable of influencing, the payment or receipt of money." 31 U.S.C. § 3729(b)(4). A false representation that Medicare is the appropriate primary payer — when it is in fact the secondary payer — plainly satisfies this standard. If Medicare knew USAA was primary, it would not make the conditional payment in the first instance; it would require the pharmacy to re-submit to USAA. *See Escobar*, 579 U.S. at 193-94.

Caremark's waiver argument proves too little. The theoretical possibility that the Secretary *might* waive the conditional payment in some future circumstance does not mean the claim was not false when it was submitted, or that the false representation did not influence the government's decision to pay. The government pays conditional claims because it does not know another primary payer exists. If it did know, it could require re-submission to the primary payer — and Medicare's structural inability to know this in real time, (it "pays in the dark," *Baxter*, 345 F.3d at 901) is precisely why Caremark's false presentation is harmful and material.

*Causation.* The presentment theory requires that the false presentation *caused* the government to pay. FAC ¶¶ 42, 60, Ex. B. The causal chain is direct: Caremark presents claim to Medicare → Medicare (not knowing USAA is primary) makes conditional payment → USAA

19

never reimburses → the government sustains a loss. This is a paradigmatic case of a false presentment causing government payment.

## IV. THE FCA'S QUI TAM PROVISIONS ARE CONSTITUTIONAL

Caremark's argument that the FCA is unconstitutional is foreclosed by binding Fifth Circuit precedent. The Fifth Circuit, sitting *en banc*, upheld the constitutionality of the FCA's qui tam provisions in Riley, 252 F.3d 749. The district court cases Caremark cites are from other circuits and are not binding on this Court. As a court in this very district recently confirmed: "this Court is not bound by another district court's reasoning. And, as Defendants concede, the Fifth Circuit has held that the FCA's qui tam provisions do not violate the Appointments Clause." *Koman Constr., LLC*, 2025 U.S. Dist. LEXIS 164904, at \*55-56.

## IN THE ALTERNATIVE, LEAVE TO AMEND SHOULD BE GRANTED

To the extent the Court finds any deficiency in the First Amended Complaint, Relator respectfully requests leave to amend. The Fifth Circuit is particularly liberal in granting leave to amend when a complaint is first dismissed. *Hart v. Bayer Corp.*, 199 F.3d 239, 247 n.6 (5th Cir. 2000) (leave should be granted "unless . . . the plaintiff has failed to plead with particularity after being afforded repeated opportunities to do so"). There has been no prior dismissal of the claims against Caremark, and amendment would not be futile. *Fin. Acquisition Partners, LP v. Blackwell*, 440 F.3d 278, 291 (5th Cir. 2006).

## CONCLUSION

For the foregoing reasons, Relator respectfully requests that the Court **deny** Defendant Caremark RX, L.L.C.'s Motion to Dismiss in its entirety. In the alternative, Relator requests leave to amend the Amended Complaint.

Dated: March 9, 2026                          Respectfully submitted,

**ATTORNEYS FOR RELATOR**

ARMAS BERTRAN ZINCONE
4960 SW 72nd Avenue
Suite 206
Miami, Florida 33155
Telephone 786 394 0491
alfred@armaslaw.com

By: */s/ Francesco A. Zincone*
Francesco A. Zincone
(Pro hac vice Florida Bar Number: 100096)

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing was served electronically using the CM/ECF filing system on March 9, 2026.

*/s/ Francesco A. Zincone*